Commonwealth *v.* Armao et al., Appellants.

326

Argued November 12, 1970. Before JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused February 14, 1972.

*Angelo A. Guarino* and *David F. Maxwell,* with them *Obermayer, Rebmann, Maxwell & Hippel,* for appellants.

*David Richman,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, January 20, 1972:

We must here decide whether the Pennsylvania statute pertaining to criminal libel, Act of June 24, 1939, P. L. 872, §412, 18 P.S. §4412,[1] and the Act of April 11, 1901, P. L. 74, §1, 19 P.S. §801,[2] as modified by Article I, Section 7 of the Pennsylvania Constitution,[3]

---

[1] The Act of June 24, 1939, provides: "Whoever writes, prints, publishes or exhibits any malicious or defamatory libel, tending either to blacken the memory of one who is dead, or the reputation of one who is alive, thereby exposing him to public hatred, contempt or ridicule, is guilty of libel, a misdemeanor, and on conviction, shall be sentenced to pay a fine not exceeding five hundred dollars ($500), or undergo imprisonment not exceeding one (1) year, or both."

[2] The Act of April 11, 1901 provides: "In all criminal prosecutions or indictments for libel, no conviction shall be allowed if the subject matter of the publication, whether contained in newspapers or otherwise, relates to candidates for public office or the official conduct of public officers, and is found to the satisfaction of the jury to be proper for public information or investigation and not to have been maliciously or negligently made. In all such cases the truth may be given in evidence to the jury."

[3] Article I, Section 7 of the Pennsylvania Constitution reads in pertinent part: ". . . No conviction shall be had in any prosecution for the publication of papers relating to the official conduct

is of any further force or effect in light of a series of recent decisions by the United States Supreme Court concerning libel and the First Amendment.[4] Upon review we find that neither the statutes nor the last sentence of Article I, Section 7, comport with our basic federal constitutional guarantees concerning freedom of speech and freedom of the press.

Little dispute exists as to the relevant factual background. Appellant Arnold R. Orsatti owned and published a weekly newspaper, *Il Popolo Italiano,* on which appellant Eugene V. Armao served as the Managing Editor. According to its signature, the paper is "Circulated From Coast-to-Coast And Throughout Italy With Major Bureaus in Philadelphia and Rome" and is "The Largest Weekly Newspaper in both English and Italian in America."

---

of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all *indictments for libels* the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases."

The ensuing discussion of the validity of this section is limited strictly to the above quoted last sentence of Article I, Section 7, concerning libel prosecutions.

[4] See, e.g., *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S. Ct. 1811 (1971) ; *Ocala Star-Banner Company v. Damron,* 401 U.S. 295, 91 S. Ct. 628 (1971) ; *Time, Inc. v. Pape,* 401 U.S. 279, 91 S. Ct. 633 (1971) ; *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 91 S. Ct. 621 (1971) ; *Greenbelt Cooperative Pub. Ass'n. v. Bresler,* 398 U.S. 6, 90 S. Ct. 1537 (1970) ; *St. Amant v. Thompson,* 390 U.S. 727, 88 S. Ct. 1323 (1968) ; *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S. Ct. 197 (1967) ; *Associated Press v. Walker,* 388 U.S. 130, 87 S. Ct. 1975 (1967) ; *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S. Ct. 1975 (1967) ; *Time, Inc. v. Hill,* 385 U.S. 374, 87 S. Ct. 534 (1967) ; *Garrison v. Louisiana,* 379 U.S. 64, 85 S. Ct. 209 (1964) ; *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710 (1964).

On April 10, 1963, an article appeared on the front page of the paper, authored by Armao and headlined: "Liquor Trade Tabloid 'Observer' Linked to Operation of Notorious S. A. Club". The pertinent portion of the article containing the alleged libelous matter reads: "The name James Buchanan, Associate Editor of the liquor trade tabloid 'Observer' (which wields considerable influence with members of the liquor industry and the Pennsylvania State Liquor Control Board) also appears as the President and Director of the notorious S. A. Club (Sports Alliance) at 212 South 13th Street, while Mr. James Buchanan is also listed as a director of the CR Club (Club Revel, Incorporated) at 810-12 South Darien Street. The S. A. Club has been well-known as a hangout for sex deviates. It is housed in a building owned by Cove, Inc., with relatives of Frank Palumbo on the Board."

Appellants were subsequently indicted and charged with several counts of criminal libel in violation of the Act of June 24, 1939, supra. Trial was held before a court sitting without a jury, and on August 28, 1964, appellants were adjudged guilty solely on Bill No. 152 concerning the *Il Popolo Italiano* article. Post trial motions were made on their behalf, and while the motion in arrest of judgment was denied, the motion for a new trial was granted on June 23, 1965, because of possible prejudice to appellants due to the consolidation of the numerous libel counts, on all but one of which they had been found not guilty.

After a motion to quash the indictment was denied, appellants were retried on Bill No. 152 on June 18, 1968, before a court and a jury, and again they were adjudged guilty. Post trial motions were denied by the court en banc on January 23, 1969, and on July 3, 1969, appellant Orsatti was sentenced to fifteen days in prison and appellant Armao received a $400 fine.

The Superior Court affirmed per curiam without opinion on March 20, 1970,[5] and we granted allocatur.

The Commonwealth admits that read alone, the criminal libel statute would be difficult to construe constitutionally.[6] However, it is urged that an appropriate preserving construction can be accomplished by interpreting the statute in conjunction with the last sentence of Article I, Section 7 of the Pennsylvania Constitution and the Act of April 11, 1901, both of which have been set forth in full in the margin. Read together, the constitutional and statutory provisions insulate one who makes a publication in newspapers or otherwise concerning "the official conduct of officers or men in public capacity",[6a] "candidates for public office",[6b] or "any other matter proper for public investigation or information"[6c] from criminal sanctions if the publication was not maliciously or negligently uttered. Truth may be given in evidence, but it is not an absolute defense; as long as the defamatory matter tends, as the statute requires, ". . . to blacken the memory of one who is dead or the reputation of one who is alive, thereby exposing him or her to public hatred, contempt or ridicule",[6d] an offense under the statute has been established.[7] Such a statutory and state con-

---

[5] Judges HOFFMAN and CERCONE not participating.

[6] The Commonwealth's "conceding" a statute's unconstitutionality is, of course, not dispositive of the issue. See *Demczuk Estate*, 444 Pa. 212, 282 A. 2d 700 (1971).

[6a] Article I, Section 7, Pennsylvania Constitution.

[6b] Act of April 11, 1901, P. L. 74, §1, 19 P.S. §801.

[6c] Article I, Section 7, Pennsylvania Constitution.

[6d] Act of June 24, 1939, P. L. 872, §412, 18 P.S. §4412.

[7] There has been a dearth of Pennsylvania decisions on criminal libel. The general statement of the law has been that the truth is only a defense when the publication was made with good motives and for justifiable ends. Hence, under present Pennsylvania law, a conviction for criminal libel could conceivably be based on a true statement, published maliciously, for non-justifiable ends,

stitutional scheme does not satisfy the demands of the First Amendment.

Beginning in 1964, the United States Supreme Court decided a series of cases defining the limitations upon state libel laws imposed by the constitutional guarantees of freedom of speech and freedom of the press. In the seminal case of *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964), it was held that in a civil action by a public official against a newspaper, First Amendment guarantees required clear and convincing proof that a defamatory falsehood alleged as libel was published with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-280, 84 S. Ct. at 726.

The *New York Times* privilege was subsequently extended to defamatory false statements concerning the conduct of "public figures", *Curtis Publishing Co. v.*

---

tending to disgrace and degrade the libeled person. As was stated in *Respublica v. Dennie*, 4 Yeates 267 (1805) : "It is no infraction of the law to publish temperate investigations of the nature and forms of government. . . . But there is a marked and evident distinction between such publications, and those which are plainly accompanied with a criminal intent, deliberately designed to unloosen the social band of union, totally to unhinge the minds of the citizens, and to produce popular discontent with the exercise of power, by the known constituted authorities. These latter writings are subversive of all government and good order. 'The liberty of the press consists in publishing the truth, from good motives and for justifiable ends, though it reflects on government or on magistrates.' *Per* general Hamilton in Crosswell's trial, pp. 63, 64. It disseminates political knowledge, and by adding to the common stock of freedom, gives a just confidence to every individual. But the malicious publications I have reprobated infect insidiously the public mind with a subtle poison, and produce the most mischievous and alarming consequences, by their tendency to anarchy, sedition, and civil war." Id. at 270.

See also *Commonwealth v. Storey*, 49 Pa. Superior Ct. 282 (1912). See generally, 22 P.L.E., Libel and Slander, §73 (1959).

*Butts,* 388 U.S. 130, 87 S. Ct. 1975 (1967), and to non-defamatory false statements about persons who are not public figures but who were involuntarily in the public eye. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S. Ct. 534 (1967). More recently in June, 1971, the knowing or reckless falsity standard established by *New York Times,* was applied to a state civil libel action brought, not by a "public figure", but by a private individual for an asserted defamation published ". . . about the individual's involvement in an event of public or general interest." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 31-32, 91 S. Ct. 1811, 1814 (1971) (footnote omitted).

In the plurality opinion in *Rosenbloom* it was emphasized that First Amendment protections were not confined to issues of government:

". . . the constitutional protection was not intended to be limited to matters bearing broadly on issues of responsible government. '[T]he Founders . . . felt that a free press would advance "truth, science, morality, and arts in general" as well as responsible government'. Id. at 147. [Curtis Publishing Co. v. Butts, 388 U.S. at 147, 87 S. Ct. at 1987] (opinion of HARLAN, J.) Comments in other cases reiterate this judgment that the First Amendment extends to myriad matters of public interest. In Time, Inc. v. Hill, supra, we had 'no doubt that the . . . opening of a new play linked to an actual incident, is a matter of public interest,' 385 U.S. at 388 [87 S. Ct. at 542], which was entitled to constitutional protection. Butts held that an alleged 'fix' of a college football game was a public issue. Associated Press v. Walker, 388 U.S. 130 (1967), a companion case to Butts, established that the public had a similar interest in the events and personalities involved in federal efforts to enforce a court decree ordering the enrollment of a Negro student in the University of Miss-

issippi. Thus, these cases underscore the vitality, as well as the scope, of the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open.' New York Times Co. v. Sullivan, 376 U.S. at 270-271 [84 S. Ct. at 721] (emphasis added).

"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." Id. at 42-43, 91 S. Ct. at 1819 (footnote omitted) (Mr. Justice BRENNAN, joined by the Chief Justice and Mr. Justice BLACKMUN).[8]

While the Commonwealth admits that criminal libel is a seldom prosecuted offense in this Commonwealth, and there is a paucity of decisions interpreting the stat-

---

[8] Although only three members of the Court joined in Mr. Justice BRENNAN's opinion, we note the following observations of Mr. Justice WHITE in the same decision.

"Given this spectrum of proposed restrictions on state defamation laws and assuming that Mr. Justice BLACK and Mr. Justice DOUGLAS will continue in future cases to support the severest of the restrictions, it would seem that at least five members of the Court would support each of the following rules:

"For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, *but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error.* In all actions for libel or slander, actual damages must be proved and awards of punitive damages will be strictly limited."

Id. at 58-59, 91 S. Ct. at 1827 (concurring opinion) (emphasis added). Accord, *Credit Bureau of Dalton, Inc. v. CBS News*, 40 U.S.L. W. 2189 (N.D. Ga. 1971).

ute here in question, we are not unaided in our application of the above First Amendment principles to Pennsylvania's criminal libel provisions. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S. Ct. 209 (1964), the Court held that a Louisiana criminal libel statute incorporated constitutionally invalid standards in the context of criticism of public officials in that it directed punishment for true statements made with malice. The statute was also infirm because it attached adverse consequences to false statements against public officials if made with ill will without regard to whether they were made with knowledge of their falsity or in reckless disregard of whether they were true or false. Because the Commonwealth presses arguments concerning the social utility of a broad criminal libel statute for the prevention of disruption of the public order, we deem the following excerpts from *Garrison* to be relevant.

". . . [W]e see no merit in the argument that criminal libel statutes serve interests distinct from those secured by civil libel laws, and therefore should not be subject to the same limitations. At common law, truth was no defense to criminal libel. Although the victim of a true but defamatory publication might not have been unjustly damaged in reputation by the libel, the speaker was still punishable since the remedy was designed to avert the possibility that the utterance would provoke an enraged victim to a breach of peace. . . .

"Even in [the mid-nineteenth century], however, preference for the civil remedy, which enabled the frustrated victim to trade chivalrous satisfaction for damages, had substantially eroded the breach of the peace justification for criminal libel laws. In fact, in earlier, more violent, times, the civil remedy had virtually pre-empted the field of defamation; except as a

weapon against seditious libel, the criminal prosecution fell into virtual desuetude. Changing mores and the virtual disappearance of criminal libel prosecutions lend support to the observation that '. . . under modern conditions, when the rule of law is generally accepted as a substitute for private physical measures, it can hardly be urged that the maintenance of peace requires a criminal prosecution for private defamation.' Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 924 (1963). The absence in the Proposed Official Draft of the Model Penal Code of the American Law Institute of any criminal libel statute on the Louisiana pattern reflects this modern consensus. The ALI Reporters, in explaining the omission . . . [observed:]

'It goes without saying that penal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person in ways that entitle him to maintain a civil suit. Usually we reserve the criminal law for harmful behavior which exceptionally disturbs the community's sense of security. . . . It seems evident that personal calumny falls in neither of these classes in the U.S.A., that it is therefore inappropriate for penal control, and that this probably accounts for the paucity of prosecutions and the near desuetude of private criminal libel legislation in this country. . . .' Model Penal Code, Tent. Draft No. 13, 1961, §250.7, Comments, at 44.

"The Reporters therefore recommended only narrowly drawn statutes designed to reach words tending to cause a breach of the peace, . . . But Louisiana's rejection of the clear-and-present-danger standard as irrelevant to the application of its statute, 244 La., at 833, 154 So. 2d, at 416, coupled with the absence of any limitation in the statute itself to speech calculated to cause breaches of the peace, leads us to conclude

that the Louisiana statute is not this sort of narrowly drawn statute.

"We next consider whether the historical limitation of the defense of truth in criminal libel to utterances published 'with good motives and for justifiable ends' should be incorporated into the New York Times rule as it applies to criminal libel statutes; . . . [W]e agree with the New Hampshire court in State v. Burnham, 9 N.H. 34, 42-43, 31 Am. Dec. 217, 221 (1837):

'If upon a lawful occasion for making a publication, he has published the truth, and no more, there is no sound principle which can make him liable, even if he was actuated by express malice.

. . . .

'It has been said that it is lawful to publish truth from good motives, and for justifiable ends. But this rule is too narrow. If there is a lawful occasion—a legal right to make a publication—and the matter true, the end is justifiable, and that, in such case, must be sufficient.'

"Moreover, even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. . . .

"We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in New York Times, 376 U.S., at 279-280 [84 S. Ct. at 724-726], apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanc-

tions where discussion of public affairs is concerned. And since '. . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive" . . .,' 376 U.S. at 271-272 [84 S. Ct. at 721], only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan, 376 U.S. at 270 [84 S. Ct. at 721]." Id. at 67-71, 73-75, 85 S. Ct. at 212-16 (footnotes and citations omitted).

Applying these principles to the *statutes* underlying appellants' convictions (Article I, Section 7 will be considered separately infra), we find the legislative scheme inadequate in several areas. The statutory language makes no provision for truth being an absolute defense. Likewise, no recognition is given the reckless disregard and knowing falsity standard mandated by *New York Times* and *Garrison*. The Pennsylvania criminal libel statutes are only limited in their application to criticisms of "public officers" or "candidates", but *Rosenbloom* clearly extends the First Amendment guarantees in this area to public issues and events of public or general interest.[9] Finally, as *New York Times*

---

[9] Although we do not reach the issue because of our ruling that the whole statutory scheme is invalid on its face, we note that the trial court stated in its charge to the jury that this case involves a matter of public interest.

and *Garrison* strongly intimate "negligence" is a wholly inappropriate concept in the area of freedom of speech and of the press. Only a knowing falsity or reckless disregard of the truth are actionable in civil defamation. It would violate all sound and fundamental principles of justice to have a merely negligent statement an occasion for the imposition of criminal penalties, and the First Amendment as interpreted by the United States Supreme Court forbids such a result.

The Commonwealth urges us to in effect re-draft the criminal libel statutes in accordance with First Amendment requirements. To accede to this request would be to undertake a wholly inappropriate judicial activity amounting to judicial legislation. See *State Board of Chiropractic Examiners v. Life Fellowship of Pennsylvania*, 441 Pa. 293, 300, 272 A. 2d 478, 482 (1971); *Saulsbury v. Bethlehem Steel Co.*, 413 Pa. 316, 320, 196 A. 2d 664, 667 (1964). Nor can we perceive any possible means of merely severing out the invalid portions of the statutes, for not only must the legislative body have intended the statute or section to be separable, but also the act must be capable of separation in fact. See *Saulsbury v. Bethlehem Steel Co.*, supra, at 320-21, 196 A. 2d at 666-67.

As for Article I, Section 7 of the Pennsylvania Constitution, we believe the last sentence of the section, which is set forth in the margin,[10] is equally repugnant to the guarantees of the First Amendment. While the section is arguably broad enough to include general public issues, the "maliciously or negligently" standard does not satisfy the stringent *New York Times* or *Garrison* requirement of actual malice or reckless disregard for the truth. However, we are of the view that the last sentence of Section 7 is severable from the first

[10] See note 3 supra.

portion of the section dealing with freedom of the press generally.

Accordingly, the order of the Superior Court affirming the judgment of sentence of the Court of Common Pleas of Philadelphia is reversed and defendants are discharged.

Mr. Chief Justice JONES and Mr. Justice O'BRIEN dissent.

Former Mr. Chief Justice BELL took no part in the consideration or decision of this case.

Mr. Justice COHEN took no part in the decision of this case.