2002 UT 110

**In re I.M.L., a minor, Appellant,**

v.

**STATE of Utah, Appellee.**

**No. 20010159.**

Supreme Court of Utah.

Nov. 15, 2002.

Stephen C. Clark, Janelle P. Eurick, Richard A. Van Wagoner, Robert J. Shelby, Salt Lake City, for appellant.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Kent M. Barry, Asst. Att'ys Gen., Salt Lake City, Leo Kanell, Beaver, for appellee.

Jeffrey J. Hunt, David C. Reymann, Salt Lake City, Amicus Curiae.

DURHAM, Chief Justice.

¶ 1 In this case we consider the application of a law drafted more than one hundred years ago to the most modern of preoccupations—the Internet. I.M.L., a high school student, was charged with criminal libel for creating an Internet web site on which he displayed disparaging comments about his teachers, classmates, and principal. He moved to dismiss, claiming that the statute under which he was charged unduly burdens free speech and is unconstitutional on its face. The juvenile court denied the motion. We reverse.

## BACKGROUND

¶ 2 During the 1999–2000 school year, I.M.L. was a student at Milford High School in Milford, Utah. He was sixteen years old. During that time he created an Internet web site on his home computer. The site included a page that listed various students at Milford High and purported to describe each person's sexual history. A second page stated that Milford High's school principal is a "town drunk" and accused him of sleeping with the secretary of the high school. Another page listed various faculty at the school and made arguably or potentially derogatory comments about most of them, stating, for example, that one teacher is a "[p]ossible [h]omosexual leading a double life," and that another is "[p]ossibly addicted to speed or some other narcotic." Finally, a page was dedicated to defending a female student who had apparently been slandered on some other person's web site. I.M.L. left a piece of paper containing the Internet address of his web site in the high school computer lab so that others would find the site.

¶ 3 After receiving complaints about the site,[1] the Beaver County Sheriff's Department began a criminal investigation, which led to the arrest of I.M.L. After being arrested and waiving his right to counsel or the presence of a parent, I.M.L. admitted creating the site and stated that he had done so in order to respond to similar sites created by other students at his high school.[2] He stated that he made disparaging comments about the faculty because he "just [didn't] like them" and was "just messing around with them." He stated that he attacked the principal's character because he "hate[d]" the principal.

¶ 4 I.M.L. was charged with criminal libel, in violation of Utah Code section 76–9–502, and criminal slander, imputing unchastity to

---

1. The complaints apparently derived from concern that the web site in some way was a precursor to school violence. The web site, however, contained no references to violence or threats of any kind. Cf. *J.S. v. Bethlehem Area Sch. Dist.*, 757 A.2d 412, 416 (Pa.2000) (expulsion of child upheld where child created web site that proposed murdering teacher).

2. According to I.M.L., none of the other students who created similar web sites were arrested or incarcerated.

a female, in violation of Utah Code section 76–9–507. The State decided not to pursue the slander charge, and the juvenile court dismissed that charge without prejudice.

¶ 5 I.M.L. moved to dismiss the libel charge, arguing that the criminal libel statute is unconstitutional on its face. He argued that the statute fails to punish only "actual malice," as defined by the United States Supreme Court, and does not provide for truth as an absolute defense. The juvenile court denied the motion, holding that the term "malicious" in the statute should be interpreted to have the same meaning as "actual malice" in First Amendment analysis and that the statute, when read in conjunction with the Utah Constitution, provides sufficient protection for truthful statements.

¶ 6 At I.M.L.'s request, the juvenile court certified its order as final, and I.M.L. appealed the order to the Utah Court of Appeals. The Court of Appeals determined that the matter was appropriate to consider as an interlocutory appeal and certified the appeal to this court.

**STANDING**

■ ¶ 7 I.M.L. concedes the State's factual allegations for purposes of this appeal, but reserves the right to dispute them should the case go to trial. Thus, in this appeal I.M.L. does not claim that his statements were true or that they were made without knowledge or recklessness. Because this is a facial challenge based on the First Amendment, however, I.M.L. has standing regardless of whether his conduct was constitutionally

privileged. *Bigelow v. Virginia,* 421 U.S. 809, 815–16, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1974). The United States Supreme Court has allowed standing in such cases "because of the 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.'" *Id.* at 816, 95 S.Ct. 2222 (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

**STANDARD OF REVIEW**

■ ¶ 8 " 'A constitutional challenge to a statute presents a question of law, which we review for correctness.... When addressing such a challenge, this court presumes that the statute is valid, and we resolve any reasonable doubts in favor of constitutionality.' " *State v. Morrison,* 2001 UT 73, ¶ 5, 31 P.3d 547 (quoting *State v. Lopes,* 1999 UT 24, ¶ 6, 980 P.2d 191).

**ANALYSIS**

■ ¶ 9 I.M.L. claims that Utah's criminal libel statute is unconstitutionally overbroad because it fails to require "actual malice" as defined by the United States Supreme Court and allows prosecution for true statements.[3] Before addressing I.M.L.'s arguments,[4] we briefly review the development of criminal libel law.

**I. CRIMINAL LIBEL AND THE FIRST AMENDMENT**

¶ 10 The history and development of statutes criminalizing forms of defamation have

**3.** Generally, we avoid reaching constitutional issues if a case can be decided on other grounds. *See West v. Thomson Newspapers,* 872 P.2d 999, 1007 (Utah 1994). Defamation is an area of law particularly well suited to being resolved on state law grounds. *Id.* at 1005. In this appeal, however, we go directly to the question of federal constitutionality because I.M.L. has only challenged the statute as violating the United States Constitution.

**4.** In this appeal, we decide only whether the criminal libel statute is unconstitutional on its face. Contrary to Justice Wilkins's analysis, we do not consider the statute as applied to the circumstances of this case. This ruling in no way expands constitutional protection to intentional, knowing falsehoods made to disparage

officials. Further, we need not, and do not, come to any conclusions about the extent of First Amendment protection that should be afforded Internet publications such as the one here, nor do we consider whether any of the persons attacked by this particular publication qualify as public figures. Because we do not reach beyond the statute, we also need not consider whether a publication such as this, authored by a minor and placed inconspicuously on an obscure web address, is reasonably presumed harmful to the reputations of those allegedly impugned by the text. *Cf. West,* 872 P.2d at 1008 n. 14 (stating that civil libel requires a showing that the victim was actually exposed to "public hatred, contempt or ridicule"); *Cox v. Hatch,* 761 P.2d 556, 561 (Utah 1988) (same).

been discussed in a number of cases and commentaries. *See, e.g., Garrison v. Louisiana,* 379 U.S. 64, 67–68, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Fitts v. Kolb,* 779 F.Supp. 1502, 1506–09 (D.S.C.1991); *Gottschalk v. State,* 575 P.2d 289, 291–92 & n. 3 (Alaska 1978) (identifying several journal articles); *Eberle v. Mun. Ct.,* 55 Cal.App.3d 423, 427–30, 127 Cal.Rptr. 594 (1976); *State v. Browne,* 86 N.J.Super. 217, 206 A.2d 591, 594–97 (Ct.App.Div.1965). From the earliest times, such laws prohibited defamatory comments about public or private citizens. *Fitts,* 779 F.Supp. at 1506–07; *Gottschalk,* 575 P.2d at 291. The prohibition against defamation was seen to serve two purposes: first, the laws were deemed necessary to prevent political unrest arising from criticism of government officials; second, they were intended to maintain public order, which might otherwise be disrupted by duels or other violence brought on by criticism of private citizens. *Fitts,* 779 F.Supp. at 1507; *Gottschalk,* 575 P.2d at 291. Under these laws, any statement that tended to degrade or disgrace another-whether opinion or fact, truthful or false-was considered defamatory. *Garrison,* 379 U.S. at 67–68, 85 S.Ct. 209; *Fitts,* 779 F.Supp. at 1507; *Gottschalk,* 575 P.2d at 291. Indeed, true statements were considered the greater danger, "for, as the woman said, she would never grieve to be told of her red nose if she had not one indeed." *Fitts,* 779 F.Supp. at 1506–07 (quoting Kelly, *Criminal Libel and Free Speech,* 6 Kan. L.Rev. 295, 301 (1958)); *see also Gottschalk,* 575 P.2d at 291.

¶ 11 The passage of the First Amendment to the United States Constitution did not initially diminish the use of criminal defamation statutes:

> Thus, the Sedition Act of 1798 made unlawful writing, publishing or speaking anything "false, scandalous and malicious ... against the government ... or the President ... with intent to defame ... or to bring them ... into contempt or disrepute...." This unpopular act was not long in existence, but was never held unconstitutional. Further, it has not been ortho-

dox constitutional doctrine that the First Amendment was intended to bar criminal defamation, although some of our most eminent judges have believed it was. The primary substantive reform effected by the American states was to modify the rule that truth was no defense. Most states ... made truth a defense so long as the otherwise defamatory statement was uttered with good motives and for a justifiable end.

*Gottschalk,* 575 P.2d at 291–92 (citations omitted). Like that of many other states, *see Garrison,* 379 U.S. at 73 n. 7, 85 S.Ct. 209, the Utah Constitution modified the common law so that evidence of truth could be offered as a defense to defamation, provided the statement was made with good intent. Utah Const. art. 1, § 15.

¶ 12 The common law of criminal defamation remained otherwise in force until well into the twentieth century. *Gottschalk,* 575 P.2d at 292. Then, in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court held that civil sanctions could not be imposed based upon defamatory statements made concerning a public official unless the statements were false and made with "actual malice." 376 U.S. at 280, 84 S.Ct. 710. The Court defined "actual malice" as making a statement "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* The Court reasoned that such a rule was necessary to maintain the principle that "debate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 S.Ct. 710.

¶ 13 In *Garrison,* the Court held that the same rule applies to criminal defamation. The Court struck down Louisiana's criminal libel statute, finding that the statute infringed upon protected speech by punishing false statements concerning public officials made without "actual malice":[5]

> Changing mores and the virtual disappearance of criminal libel prosecutions lend support to the observation that "under modern condi-

---

5. The Court also noted that where private defamation suits are available, there is little need for statutes that criminalize defamation:

[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.

*Id.* at 73, 85 S.Ct. 209. The Court further held that a statute is manifestly unconstitutional if it fails to provide truth as an absolute defense to criminal or civil liability:

Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive' ...," only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government.

*Id.* at 74–75, 85 S.Ct. 209 (quoting *New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710). Following the *Garrison* decision, a number of states have declared their criminal defamation statutes unconstitutional for failing to limit criminal liability to statements made with actual malice. *See, e.g., Fitts,* 779 F.Supp. at 1515–16; *Ivey v. State,* 821 So.2d 937 (Ala.2001); *Gottschalk,* 575 P.2d at 296; *Weston v. State,* 258 Ark. 707, 528 S.W.2d 412, 416 (1975); *Eberle,* 55 Cal.App.3d at 432–33, 127 Cal.Rptr. 594 (1976); *State v. Helfrich,* 277 Mont. 452, 922 P.2d 1159, 1161 & 1163 (1996) (collecting cases and holding statute unconstitutional); *Commonwealth v.*

tions, when the rule of law is generally accepted as a substitute for private physical measures, it can hardly be urged that the maintenance of peace requires a criminal prosecution for private defamation."

*Armao,* 446 Pa. 325, 286 A.2d 626, 632 (Pa. 1972).

## II. UTAH'S CRIMINAL LIBEL STATUTE

■ ¶ 14 "Freedom of speech is not only the hallmark of a free people, but is, indeed, an essential attribute of the sovereignty of citizenship." *Cox v. Hatch,* 761 P.2d 556, 558 (Utah 1988). Free speech must be balanced, however, against the values protected by the law of defamation, invasion of privacy, and abuse of personal identity. *Id.* at 558–59.

■ ¶ 15 I.M.L. claims that Utah's criminal libel statute, like the statute struck down in *Garrison,* is overbroad. In considering whether a statute suffers from overbreadth, " 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.' " *Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). In making this determination, "[c]riminal statutes must be scrutinized with particular care; those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id.* at 459, 107 S.Ct. 2502 (citations omitted).

■ ¶ 16 We must therefore consider whether the statute prohibits a substantial amount of constitutionally protected speech. In interpreting the statute, we look to the statute's plain language and presume that the legislature used each term advisedly. *Arredondo v. Avis Rent A Car Sys., Inc.,* 2001 UT 29, ¶ 12, 24 P.3d 928.

¶ 17 Utah Code section 76–9–502 provides: "A person is guilty of libel if he intentionally and with a malicious intent to injure another publishes or procures to be published any libel." Utah Code Ann. § 76–9–502 (2001).[6] The statute defines "libel" as follows:

*Id.* at 69, 85 S.Ct. 209 (quoting Emerson, *Toward a General Theory of the First Amendment,* 72 Yale L.J. 877, 924 (1963)).

6. Utah's criminal libel statute has existed since at least 1876 and has been modified very little since that time. *See* Comp. Laws Utah §§ 1955–1959

For the purpose of this part: "Libel" means a malicious defamation, expressed either by printing or by signs or pictures or the like, tending to defame or darken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural defects of one who is alive and thereby expose him to public hatred, contempt, or ridicule.

Section 76-9-501. Finally, the statute provides that malice may be presumed from the act of making the libel: "An injurious publication is presumed to have been malicious if no justifiable motive for making it is shown." Section 76-9-503(1).

¶ 18 Quite obviously, the plain language of Utah's statute does not comport with the requirements laid down by the United States Supreme Court. First, the statute does not punish only "actual malice" when the statement concerns public officials. The statute punishes all statements made "maliciously," but the common law definition of "malice" is quite different from the "actual malice" contemplated by the United States Supreme Court. *Fitts v. Kolb*, 779 F.Supp. 1502, 1515–16 (S.C.1991). Whereas common-law "malice" means "ill will or spite," *Cox*, 761 P.2d at 560 n. 3, the Supreme Court has emphasized that "actual malice" in this context means specifically "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We have noted that "malice" and "actual malice" are not interchangeable. *Cox*, 761 P.2d at 560 n. 3. However, even if we were to read "actual malice" into the term "maliciously," the statute would still fail because it allows malice to

be presumed if "no justifiable motive" for the libel is shown. This presumption effectively suspends traditional malice as an element of the crime and makes "a justifiable motive" merely an affirmative defense.

¶ 19 Second, the statute provides no immunity for truthful statements. Under the statute, a true statement that "publish[es] the natural defects of one who is alive" may be punished as readily as a false statement that does the same. Section 76-9-501. Thus, the statute infringes upon a substantial amount of constitutionally protected speech. Specifically, the statute improperly prohibits (1) false statements regarding public figures made without knowledge or recklessness, and (2) true statements regarding public figures.

¶ 20 Despite these constitutional failings, the trial court found the statute constitutional.[7] Based upon this court's rulings in civil libel cases, the trial court held that the reference to "malicious defamation" in the definition of "libel" should be read to have the same meaning as "actual malice" as defined by the United States Supreme Court. The trial court noted that the definition of "libel" in our civil libel statute, section 45–2–2, is nearly identical to the definition of "libel" in the criminal libel statute, section 76–9–501.[8] Because we have concluded that "actual malice" is required in a civil action for libel of a public figure, *e.g.*, *Van Dyke v. KUTV*, 663 P.2d 52, 54 (Utah 1983), and because the civil and criminal libel statutes define "libel" in similar terms, the trial court concluded that it is appropriate to assume that the criminal libel statute incorporates an "actual malice" fault requirement.

(1876); 2 Comp. Laws Utah §§ 4489–4498 (1888); Rev. Stat. Utah §§ 4196–4205 (1898); Comp. Laws Utah §§ 4196–4205 (1907); Comp. Laws Utah §§ 8072–8081 (1917); Rev. Stat. Utah §§ 103–38–1 to –8 (1933); Utah Code Ann. §§ 101–38–1 to –8 (1943); Utah Code Ann. §§ 76–40–1 to –8 (1953). When Utah's criminal code was reenacted in 1973, criminal libel was made a class A misdemeanor and the word "blacken" in the definition of libel was changed to "defame or darken." 1973 Utah Laws ch. 196, part 5, §§ 76–9–501 to –506. In 1991, the statute was modified to make criminal libel a class B misdemeanor. 1991 Utah Laws ch. 241, § 100.

7. In this appeal, the State does not support the trial court's rationale in finding the statute constitutional. Instead, the State asserts that "the juvenile court correctly concluded that the Criminal Libel Statute was constitutional, but not for the reasons it stated."

8. The civil statute defines "libel" using the same language as the criminal statute with one exception: Where the criminal statute uses the words "defame or darken" the civil statute uses the word "blacken." *Compare* Utah Code Ann. § 76–9–501 (2001) *with* Utah Code Ann. § 45–2–2 (2001).

¶ 21 The trial court erred in importing the constitutional actual malice requirement into the criminal libel statute. First, the cases on which it relied did not involve constitutional challenges to the civil libel statute. Although we applied First Amendment standards to the common law in some of those cases, in none of them did we hold that the definition of libel in section 45–2–2 must be read to include the United States Supreme Court's definition of "actual malice." *See West v. Thomson Newspapers,* 872 P.2d 999, 1004 (Utah 1994) (considering whether statements were defamatory under Utah law and explicitly not reaching any question of whether the civil libel statute is constitutional); *Cox,* 761 P.2d at 558–561 (addressing whether plaintiff's claims were barred by the First Amendment); *Van Dyke,* 663 P.2d at 54–56 (determining whether plaintiff was a "public official" under First Amendment standards). To the contrary, we have held, based upon First Amendment standards, that in a civil action for libel "actual malice" is required if the statement concerns a public official, whereas only negligence is required if the statement concerns a private citizen. *Cox,* 761 P.2d at 560; *Seegmiller v. KSL,* 626 P.2d 968, 973 (Utah 1981); *see also Van Dyke,* 663 P.2d at 54. Thus, regardless of the similar definitions of libel, in neither statute can we assume that the term "malice" has the same meaning as the "actual malice" required by the federal constitutional standard.[9] This is of particular import since we are dealing with a penal statute. To graft the "actual malice" standard onto the criminal statute would constitute more than statutory interpretation; it would require us to re-write the law by adding an essential element to the definition of the crime. *See Phelps v. Hamilton,* 828 F.Supp. 831, 848–49 (D.Kan.1993).

¶ 22 Second, even if we were to equate "actual malice" with "malice," the criminal statute would still be overbroad. Unlike the civil statute, which explicitly states that malice will not be presumed in particular circum-stances, *see* section 45–2–4, the criminal libel statute provides that malice will be presumed if no "justifiable motive" for the libel can be shown. Section 76–9–503(1). As discussed previously, this presumption removes malice as an element of the offense, allowing punishment based solely upon the statement's defamatory nature. Thus, by placing the burden of showing a "justifiable motive" on the defendant, the statute permits the punishment of statements made without knowledge or recklessness.

¶ 23 The trial court also held that the statute, when read in conjunction with Utah State Constitution article 1, section 15, offers sufficient protection to truthful statements. That section, however, only provides truth as a defense if the defendant can show that the statements were made with good intent:

> In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Utah Const. art. 1, § 15. In *Garrison,* the United States Supreme Court considered the truth and "good motives" defense and found it merely palliative. *Garrison v. Louisiana,* 379 U.S. 64, 70–73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *see also Weston v. State,* 258 Ark. 707, 528 S.W.2d 412, 415 (1975). By requiring a showing of "good motives" and "justifiable ends," this provision allows the punishment of truthful statements made with less than pure intent. As the *Garrison* court recognized, free speech cannot be limited by the motives of the speaker: "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred." *Garrison,* 379 U.S. at 73, 85 S.Ct. 209. Thus, this section of the Utah Constitution fails to bring the statute within the prescribed bounds of the First Amendment.

---

9. In the trial court's reading of the criminal libel statute, the term "malicious" in section 502 refers to the common-law definition of malice, whereas the same term in section 501 refers to "actual malice" as defined by the United States Supreme Court. This inconsistent reading of statutory terms, however, is not supported by the plain language of the statute and, we believe, would further confuse the language of an already vague statute. *See, infra,* note 11.

¶ 24 The State attempts to save the statute from its constitutional failings by interpreting it with terms derived from a similar statute, the criminal *defamation* statute enacted in 1973.[10] Unlike its overbroad predecessor,[11] the defamation statute only punishes speech if the author knows it to be false and intends it to harm the subject of the speech:

> A person is guilty of criminal defamation if he knowingly communicates to any person orally or in writing any information which he knows to be false and knows will tend to expose any other living person to public hatred, contempt, or ridicule.[12]

Section 76-9-404. The State argues that this definition of defamation should be incorporated in the criminal libel statute, which defines "libel" as "a malicious defamation" and provides no separate definition of the term "defamation." *See* Utah Code Ann. § 76-9-501 (2001). The State argues that when the legislature enacted the criminal defamation statute and simultaneously reenacted the criminal libel statute without amendment, the legislature intended to discard the common-law definition of defamation and replace it with the definition articulated in section 76-9-404. Interpreted in this way, the State asserts, the libel statute exceeds constitutional requirements by punishing only knowing falsehood and allowing truth as an absolute defense.

¶ 25 The State correctly notes that we afford statutes a strong presumption of constitutionality, *State v. Lopes,* 1999 UT 24, ¶ 6, 980 P.2d 191, and will, whenever possible, construe a statute so as to save it from constitutional infirmities. *State v. Morrison,* 2001 UT 73, ¶ 12, 31 P.3d 547. We are, however, limited in doing so by reasonable canons of statutory construction. "[W]e will not 'infer substantive terms into the text that are not already there. Rather, the interpretation must be based on the language used, and [we have] no power to rewrite the statute to conform to an intention not expressed.' " *Assoc. Gen. Contrs. v. Bd. of Oil, Gas & Mining,* 2001 UT 112, ¶ 30, 38 P.3d 291 (quoting *Berrett v. Purser & Edwards,* 876 P.2d 367, 370 (Utah 1994)); *see also Arredondo,* 2001 UT 29 at ¶ 12, 24 P.3d 928. In considering the ordinary meaning of the terms of a statute, we will not interpret the language so that it results in an application that is " 'unreasonably confused, inoperable, [or] in blatant contradiction of the express purpose of the statute.' " *O'Keefe v. Utah State Ret. Bd.,* 956 P.2d 279, 281 (Utah 1998) (quoting *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 590 (Utah 1991)). The State contends that the word "defamation" in the criminal libel statute should be defined by reference to the criminal defamation statute. The problem with that approach, however, is that the plain language of the statute would then fail to clearly inform citizens of the prohibited conduct. "To avoid chilling the exercise of vital First Amendment rights, restriction of expression must be expressed in terms which clearly inform citizens of pro-

10. I.M.L. asserts that this argument by the State is procedurally improper since it is raised for the first time on appeal. As I.M.L. notes, we may affirm a judgement based upon different grounds than those relied upon below, but only so long as the ground or theory we rely upon was raised below or is "apparent on the record." *Bailey v. Bayles,* 2002 UT 58, ¶ 10, 52 P.3d 1158 (quoting *Dipoma v. McPhie,* 2001 UT 61, ¶ 18, 29 P.3d 1225); *see also Limb v. Federated Milk Producers Ass'n,* 23 Utah 2d 222, 461 P.2d 290, 293 n. 2 (1969) (quoting 5 C.J.S. *Appeal & Error* § 1464 (1958)). We need not decide here, however, whether the State's theory is apparent on the record since we find the State's theory without merit and do not affirm the holding of the trial court.

11. The criminal libel statute may also be vulnerable to an attack as void for vagueness, due to the statute's ambiguous definition of libel, *see Fitts,*

779 F.Supp. at 1516–17; *Gottschalk,* 575 P.2d at 292–95, and its failure to define what constitutes a "justifiable motive" under section 76-9-503(1). It is also disconcerting that the statute has only rarely, and possibly inconsistently, been applied. We need not pursue this inquiry, however, since we find the statute overbroad.

12. Amici curiae also attack Utah's criminal *defamation* statute, stating that United States Supreme Court cases raise a substantial doubt "whether *any* criminal libel statute would be held constitutional." The State counters that Utah's criminal defamation statute is constitutional because it punishes only knowing falsehoods. We need not consider, however, whether Utah's criminal defamation statute passes constitutional muster since we conclude that the criminal libel statute does not incorporate the terms of the criminal defamation statute.

hibited conduct and in terms susceptible of objective measurement." *Fitts,* 779 F.Supp. at 1516. Further, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The criminal libel statute contains no indication that it is to be read by reference to another statute. The statute does not explicitly cross-reference the defamation statute, and the definition of "libel" provided in the statute gives no hint that the terms are explicated elsewhere. The terms "malicious" and "defamation" both have meanings at common law, *see Black's Law Dictionary* 427–28, 968 (7th ed.1999), and in no way are identified as terms of art by the statute. Indeed, there is no reason for the reader to conclude the two statutes are linked, especially given the fact that each one falls in a different chapter of the penal code, criminal defamation being under "offenses against privacy" and criminal libel under "libel and slander."

¶ 26 Adopting the State's interpretation would also make the statute unduly confusing. When considering statutes relating to the same subject matter, we attempt to construe them in harmony, *Lyon v. Burton,* 2000 UT 19, ¶ 17, 5 P.3d 616, and such that "effect is given to every provision in all of them." *Murray City v. Hall,* 663 P.2d 1314, 1318 (Utah 1983). The criminal defamation statute prohibits "defamation," which is defined as a knowing falsehood, that is, a statement the speaker knows to be false and knows will tend to expose another to contempt or ridicule. Utah Code Ann. § 76–9–404 (2001). The criminal libel statute, on the other hand, prohibits "malicious defamation" in written form. Utah Code Ann. § 76–9–501 (2001). Under the State's interpretation, in which the definition of "defamation" would be adopted from the criminal defamation statute, criminal libel would be defined as a

"malicious knowing falsehood." Thus, under the State's theory, one statute prohibits "knowing falsehood" in any form while the other prohibits "malicious knowing falsehood" in written form. Both statutes, however, provide the same punishment. There is no apparent reason why the legislature would create two crimes, both prohibiting the same conduct, both providing the same punishment, and yet one of the two also requiring a showing of malice.[13]

¶ 27 If we read the two statutes based on their plain language, however, this difficulty evaporates. While one statute prohibits knowing falsehoods, the other prohibits statements made maliciously with the intent to harm the reputation of another. Interpreted in this way, the statutes do not significantly overlap and the provisions of each retain independent meaning.

¶ 28 Finally, the State argues that we must presume from the fact that the legislature reenacted the criminal libel statute in 1973 that it was aware of the requirements established by the United States Supreme Court and intended that the criminal libel statute borrow the definition of defamation from the criminal defamation statute. We have stated that "it is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter . . . ." *Murray City,* 663 P.2d at 1318. This presumption, however, does not inevitably lead to the conclusion that the legislature reenacted the criminal libel statute with knowledge of constitutional requirements and an intent that the statute be read to include them without so specifying. Such a possibility is rebutted by the fact that when reenacting the criminal libel statute the legislature also reenacted the criminal slander statute-a statute that uses gender-based distinctions that could readily be deemed unconstitutional.[14] *See Ivey v.*

---

13. The State's interpretation becomes increasingly redundant when applied to other offenses within the same chapter as libel. Section 76–9–509 prohibits conveying to a publisher "any false or libelous statement." Utah Code Ann. § 76–9–509 (2001). If "libel" means a malicious, knowingly false statement, then this section is redun-

dant, prohibiting both *false* statements and malicious, knowingly *false* statements.

14. The criminal slander statute provides: "A person is guilty of slander if he orally, falsely and knowingly, imputes to any female, married or unmarried, a lack of chastity." Utah Code Ann. § 76–9–507 (2001).

*State,* 821 So.2d 937, 945 (Ala.2001) (citing *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), declaring unconstitutional a state statute that imposed alimony obligation on husband but not wife). Thus, while we are generally inclined to presume the legislature acts with knowledge of constitutional requirements and an intent to comply with them, we cannot in good conscience make that leap of faith here. *Id.* ("The fact that in reenacting the criminal defamation statute the Legislature retained this unconstitutional gender-based provision rebuts any presumption that the Legislature intended to comply with United States Supreme Court precedents....").

¶ 29 Given that the statute contains no indication that its terms are defined elsewhere, that reading the two statutes as linked places them in conflict, and that there is no cause to presume the legislature intended the statutes be read together, we conclude that the libel statute does not incorporate the definition of defamation found in the criminal defamation statute. To rule otherwise would require us to read substantive terms into the statute that are not already there. *See Assoc. Gen. Contrs.,* 2001 UT 112 at ¶ 30, 38 P.3d 291 (stating we will not read substantive terms into a statute); *see also Fitts,* 779 F.Supp. at 1511 (refusing to read "actual malice" into statute without such language because doing so would invade the province of the legislature); *Ivey,* 821 So.2d at 949 (same); *Gottschalk,* 575 P.2d at 296 (same); *Weston,* 528 S.W.2d at 416 (same); *Eberle,* 55 Cal.App.3d at 433, 127 Cal.Rptr. 594 (same); *State v. Helfrich,* 277 Mont. 452, 922 P.2d 1159, 1161 (1996) (same); *Commonwealth v. Armao,* 446 Pa. 325, 286 A.2d 626, 632 (1972) (same). Based upon the plain language of the statute, therefore, we hold that the criminal libel statute prohibits defamatory statements *without regard for the truth of the statements* or whether they were made knowingly or recklessly. Thus, the statute is overbroad.

## CONCLUSION

¶ 30 We hold that Utah's criminal libel statute, Utah Code Ann. §§ 76-9-501 to – 503, infringes upon a substantial amount of constitutionally protected speech by punishing false statements regarding public figures made without knowledge or recklessness and true statements regarding public figures. The statute is therefore overbroad and unconstitutional. We reverse the denial of I.M. L.'s motion to dismiss.

¶ 31 Justice HOWE and Judge BILLINGS concur in Chief Justice DURHAM's opinion.

¶ 32 Having disqualified himself, Associate Chief Justice DURRANT does not participate herein; Court of Appeals Judge JUDITH M. BILLINGS sat.

RUSSON, Justice, concurring in the result:

¶ 33 I concur in the result of the court's opinion. I write separately, however, to state why I think Utah's criminal libel statute, Utah Code Ann. § 76-9-502 (2001), is unconstitutional on its face, and go no further.

¶ 34 Modern libel jurisprudence, both civil and criminal, begins with two landmark United States Supreme Court decisions made within months of each other almost four decades ago: *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). In *New York Times v. Sullivan,* the Court held that public officials could not recover in a civil action for defamatory statements unless such statements were both (1) false and (2) made with "actual malice." The decision thus provided truth as an absolute defense and created a higher standard for recovery beyond common law malice. Common law malice is limited to mere "ill will or spite." *See, e.g., Cox v. Hatch,* 761 P.2d 556, 560 n. 3 (Utah 1988). In contrast, the United States Supreme Court established that "actual malice" required a showing that a defamatory statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710. *Compare Black's Law Dictionary* 1109 (4th ed.1968) (defining "malice" in pre-*New York Times v. Sullivan* common law context) *with Black's Law Dictionary* 968 (7th ed.1999)

(defining "actual malice" and explaining how relative meanings of "malice" and "actual malice" have changed over time). Accordingly, "actual malice" and *New York Times* malice" entered the lexicon of contemporary libel jurisprudence.

¶ 35 Soon thereafter, in *Garrison v. Louisiana*, the United States Supreme Court struck down Louisiana's criminal libel statute on constitutional grounds identical to those articulated in *New York Times*. Applying the *"New York Times* rule," the Court stated succinctly that, in regard to criticism of public officials, "[w]hether the libel law be civil or criminal, it must satisfy relevant constitutional standards." *Garrison*, 379 U.S. at 67 n. 3, 85 S.Ct. 209. Accordingly, the Louisiana statute was found to be deficient because it (1) failed to provide truth as an absolute defense and (2) allowed for punishment without a showing of "actual malice" as defined in *New York Times*.

¶ 36 In the wake of *New York Times* and *Garrison*, numerous state criminal libel statutes collapsed under constitutional challenges for not incorporating truth as an absolute defense and failing to require demonstration of "actual malice." For example, in 1972 the Supreme Court of Pennsylvania found that state's criminal libel statute unconstitutional, stating flatly that "[t]he statutory language makes no provision for truth being an absolute defense. Likewise, no recognition is given the reckless disregard and knowing falsity standard mandated by *New York Times* and *Garrison.*" *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626, 632 (1972); *see also Eberle v. Mun. Ct.*, 55 Cal.App.3d 423, 127 Cal.Rptr. 594, 600 (1976); *Ivey v. State*, 821 So.2d 937, 949 (Ala.2001); *Gottschalk v. State*, 575 P.2d 289, 296 (Alaska 1978); *Weston v. State*, 258 Ark. 707, 528 S.W.2d 412, 416 (1975); *State v. Helfrich*, 277 Mont. 452, 922 P.2d 1159, 1162 (1996); *Fitts v. Kolb*, 779 F.Supp. 1502, 1515, 1519 (D.S.C. 1991). Even prior to *New York Times* and *Garrison*, some authorities had begun to question the very necessity of criminal libel statutes in the modern age, when private civil remedies for defamation were readily available. *See, e.g., Garrison*, 379 U.S. at 69, 85 S.Ct. 209.

¶ 37 Constitutional statutory analysis requires focus on the plain meaning of the words of the statute and how such plain meaning comports with current constitutional standards. Under such an analysis, the Utah criminal libel statute clearly fails for the same reason similar statutes in other states have failed. The Utah statute on its face (1) does not provide truth as an absolute defense and (2) allows for punishment of defamatory statements concerning public officials without a showing of "actual malice." Instead, the language of the statute allows for criminal punishment of all statements made with "malicious intent" about any person, without any reference to whether the statements are true or false.

¶ 38 The State attempts to rescue the statute from its constitutional shortcomings by grafting definitions taken from other parts of the criminal and civil code. Not only is this argument legally incorrect—particularly the importing of terms from the civil code into the criminal code—but it ultimately ignores the plain language of the criminal libel statute. "Malice" has not carried the same meaning as "actual malice" in libel jurisprudence since *New York Times* and *Garrison* were decided almost forty years ago. Those decisions also made truth an absolute defense. The Utah criminal libel statute neither contains the *New York Times* "actual malice" constitutional language nor provides for truth as an absolute defense. No amount of standing the statute on its head can make it say what it does not say.

¶ 39 Accordingly, I agree with the majority in holding Utah's criminal libel statute, Utah Code Ann. § 76–9–502, unconstitutional on its face.

WILKINS, Justice, concurring in the result:

¶ 40 I concur in the result reached by the lead opinion, but for different reasons than those set forth therein.

¶ 41 For purposes of this appeal, the defendant admits that the statements he created and displayed on his web site were false; that they were statements that impugned the honesty, integrity, virtue and reputation of

the school's principal, his secretary and probably other faculty members; that he published the various statements intentionally in order to expose the faculty, including the principal and his secretary, to public hatred, contempt, or ridicule and that he did it because he hated them and not for any good motive or justifiable end.

¶ 42 The First Amendment was never intended to protect intentional falsehood levied against innocent, private persons. Lies serve no good purpose, serve no valid public purpose, and have no protected status in our public discourse. One who knowingly lies for the expressed purpose of doing harm to another, as did the defendant in this instance, cannot claim the protection of the constitution for his volitional breach of the social contract.

¶ 43 The statute defendant challenges, Utah Code section 76–9–502, was reenacted in 1974, following the decisions of the Supreme Court of the United States in both *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Those decisions explained that the constitution prohibits prosecution for criminal libel without proof of actual malice on the part of the defendant, which the Court in *New York Times* defined as a statement made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.,* 376 U.S. at 279–80, 84 S.Ct. 710.

¶ 44 Once the Supreme Court of the United States has announced a constitutional principle, it controls the future course of the law in that area. This is true with the application of the actual malice standard announced in *New York Times* and *Garrison.* As we said in *Seegmiller v. KSL, Inc.,* 626 P.2d 968 (Utah 1981), the state statutes regarding liability for libel and slander that were enacted prior to *New York Times* "must now, of course, be read in view of *New York Times v. Sullivan.*" *Id.* at 975. This approach, that of automatically adopting authoritative direction from the Supreme Court of the United States as part of our statutory and case law, applies even more in circumstances where the legislature has reconsid-

ered and reenacted a statute after such a ruling.

¶ 45 Here, as a single event, the Utah Legislature enacted both a criminal defamation statute requiring proof that the defendant communicates information which the defendant "knows to be false and knows will tend to expose any other living person to public hatred, contempt, or ridicule," Utah Code Ann. § 76–9–404 (1999), and the criminal libel statute that is the subject of this appeal, Utah Code Ann. § 76–9–502 (1999). They appear as consecutive sections in the criminal statutes. If the Legislature had stopped there, I would have urged my colleagues to apply the gloss of *New York Times* and its progeny to the statute in question, and uphold the decision of the trial judge in this case.

¶ 46 However, when the Legislature went on to enact section 76–9–503(1), adopting a presumption of malice "if no justifiable motive for making [the allegedly injurious publication] is shown," they went too far. Such a presumption of malice is not compatible with the "actual malice" required by the constitution. One must simply ignore section 76–9–503(1) in order to read the actual malice requirement into the "malicious intent" language of section 76–9–502. This we cannot do under our rules of statutory review, even after granting deference to the Legislature and presuming constitutionality where possible.

¶ 47 The constitution does not protect speech that is admittedly false, intended to harm, aimed at private citizens, and otherwise defamatory. As Mr. Justice Brennan wrote for the Court in *Garrison,* "[T]he use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are ... of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" 379 U.S. at 75, 85 S.Ct. 209 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). The quality of our soci-

ety depends upon the honor of its citizens. Although we are under no obligation as citizens to agree with every act of every citizen, we are required to abide by proscriptions of society with honor if we are to continue as a civil society. To ignore this obligation of citizenship is to tear at the fabric that holds us together, and ultimately risks, not preserves, the freedom we celebrate.

¶ 48 If the defendant in this instance did intentionally publish the statements attributed to him, knowing either that they were false or that he had no basis upon which to believe that they were not false, his behavior must be corrected. Private citizens such as school administrators and teachers are entitled to be free of such unwarranted, destructive, personal attacks. Moreover, one need not abandon dignity and honor to fully support the freedoms of speech guaranteed by the constitution. The Legislature should consider revising the criminal libel statute to clearly set forth the actual malice standard announced by the Supreme Court of the United States in *New York Times* and its progeny, and remove the troubling language of presumed malice in section 76–9–503(1).