Demczuk Estate.

Argued April 26, 1971. Before Bell, C. J., Jones, Eagen, O'Brien, Roberts, Pomeroy and Barbieri, JJ.

*James Francis Lawler,* with him *Ostroff & Lawler,* for appellant.

*Eugene J. Anastasio,* Deputy Attorney General, with him *J. Shane Creamer,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

Appellant, a resident of the Soviet Union, is here challenging the determination of the Orphans' Court of Bucks County that he has failed to establish sufficiently his identity as the son and residuary legatee under the will of John Demczuk,[1] who died on October 26, 1947, a resident of Bucks County. We hold appellant has on this record adequately proven his identity and is therefore entitled to take under his father's will.

After providing for his funeral expenses, the deceased devised the remainder of his estate to his son as follows: "All the rest, residue, and remainder of my estate of every kind and nature whatsoever I order and direct shall be converted into cash by my Executor hereinafter named and the net proceeds therefrom I do give, devise and bequeath to my son, HRIHORI DEMIAN-CHUK, a resident of S. Chotin, P. O. Pluznoe, Iziaslaloskoho Raiona, Winickoy Oblasei Shepetowskoho, Ok-

[1] Also known as Ivan Demczuk, John Demchuk, and John Demchick.

ruga, Russia. Should my said son predecease me, then I give and bequeath the net proceeds from my residuary estate to my grandson and son of my said son, ALEXSANDER DEMIANCHUK. Should both my son HRIHORI DEMIANCHUK and my grandson, ALEXSANDER DEMIANCHUK pre-decease me, then I give, devise and bequeath the said proceeds from my said residuary estate to PELAHIA DEMIANCHUK, wife of HRIHORI DEMIANCHUK."

The Farmers National Bank of Bucks County was named as executor in the will. The Bank filed an account on March 19, 1954, showing a balance of $7,171.-19 available for distribution, but later petitioned for the appointment of an auditor to determine to whom the fund should be distributed and whether the terms of the so-called "Iron Curtain Act", Act of July 28, 1953, P. L. 674, 20 P.S. §1155 et seq. (Supp. 1971) should be invoked. The Act provides, in essence, that whenever it appears to a court that if distribution were made, a beneficiary would not have the actual benefit, use, enjoyment or control of the money, the court can direct that the funds be delivered to the State Treasury, which becomes their custodian until the beneficiary demonstrates that he can have actual benefit or use.

Hearings were held before an auditor, who eventually filed a report authorizing the payment of the funds in question to the State Treasury. Exceptions were taken by a Philadelphia attorney, who presented a power of attorney purportedly signed by Grigory Ivanovitch Demianchuk, designating a New York City law firm to represent his interests. In essence, the exceptions urged that the funds should have been awarded to the deceased's son through his attorney-in-fact. The orphans' court dismissed the exceptions on the grounds that the claimant had not adequately established his identity and also because he would not have the actual benefit of his distributive share. See *Demc-*

*zuk Estate,* 8 Pa. D. & C. 2d 462 (Bucks County Pa. O.C. 1956).

Considerable doubt concerning the constitutionality of the Iron Curtain Act was raised by the decision of the United States Supreme Court in *Zschernig v. Miller,* 389 U.S. 429, 88 S. Ct. 664 (1968). Subsequently, on August 21, 1969, by his attorney claimant petitioned the orphans' court to order the Commonwealth to release the funds. Hearings were held during the Fall of 1969. The court, in an opinion dated June 17, 1970, denied the petition, stating that while the Iron Curtain Act was unconstitutional, claimant had still not supplied legally sufficient proof of his identity. The funds were therefore to remain on deposit in the State Treasury under the provision of the Act of April 9, 1929, P. L. 343, Art. XIII, §1314, 72 P.S. §1314.[2] The court also refused a subsequent petition for letters rogatory. This appeal ensued.

---

[2] The statute provides in pertinent part:

"Whenever, on the audit or adjudication of the account of any fiduciary, there shall be and remain in his possession any moneys not awarded to any claimant or claimants, or any moneys which shall have been awarded to any claimant or claimants the whereabouts whereof or that of their legal representatives, the fiduciary has been unable to ascertain, the fiduciary shall, within sixty days after the date of said audit or adjudication, file, in the court having jurisdiction of his account, a sworn statement of such unawarded or unclaimed moneys, with duplicate, in the same form and manner prescribed in the preceding section of this act, and thereupon proceedings to secure payment of such moneys into the State Treasury, through the Department of Revenue, to be refunded as hereinbefore provided, shall be had, similar in all respects to those hereinbefore provided for in cases where a statement of unclaimed moneys is filed at or before the filing of the final account of a receiver, except that, in proceedings under this section, the court shall, by its order, provide for the serving of a copy of the petition upon the fiduciary and shall fix a day for a hearing upon said petition."

Preliminarily, we wish to lay to rest any questions concerning the validity of the Iron Curtain Act of 1953. The Commonwealth has "conceded" the act is unconstitutional, but that is not dispositive. In the interest of clarification for bench and bar alike, we today declare the Act of July 28, 1953, supra, 20 P.S. §1155, et seq. (Supp. 1971) constitutionally infirm.

Our position on this issue was strongly intimated at the conclusion of our opinion in *Krepinevich Estate,* 433 Pa. 78, 248 A. 2d 844 (1969) where it was stated: ". . . Since we are remanding the case, we will also offer the Commonwealth an opportunity to prove that the appellant will not have the actual 'benefit, use, enjoyment or control of the money or other property' as required by Pennsylvania's Iron Curtain Act of 1953. Under this act, should the court below decide that appellant will not have the use of the money, it can award the money to the Commonwealth without escheat. If the Commonwealth decides to raise this issue on remand, it should be prepared to argue the constitutionality of the Iron Curtain Act in light of the United States Supreme Court's decision in Zschernig v. Miller, 389 U.S. 429 (1968)." Id. at 86, 248 A. 2d at 847-48 (footnotes omitted).

Several orphans' courts have likewise already ruled the act invalid. See, e.g., *Adams Estate,* 19 Fiduc. Rep. 442 (Mont. Co. O.C. 1969); *Kwiedorawicz Estate,* 19 Fiduc. Rep. 568 (Schuyl. Co. O.C. 1969); *Kuhn Estate,* 18 Fiduc. Rep. 396 (Bucks Co. O.C. 1968); *Struchman-czuk Estate,* 44 Pa. D. & C. 2d 155 (Phila. O.C. 1968).

It is not our purpose to review the cases[3] leading up to the United States Supreme Court's decision in

---

[3] See, e.g., *Belemecich Estate,* 411 Pa. 506, 192 A. 2d 740 (1963) rev. sub. nom *Consul General of Yugoslavia at Pittsburgh v. Pennsylvania,* 375 U.S. 395, 84 S. Ct. 452 (1964); *Kolovrat v. Oregon,* 366 U.S. 187, 81 S. Ct. 922 (1961); *Clark v. Allen,* 331 U.S.

*Zschernig v. Miller,* supra, for the opinion's language is sufficient to mandate our action here. As Mr. Justice DOUGLAS stated for the Court: "It seems inescapable that the type of probate law . . . [similar to the Iron Curtain Act] affects international relations in a persistent and subtle way. The practice of state courts in withholding remittances to legatees residing in Communist countries or in preventing them from assigning them is notorious. The several States, of course, have traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the Nation's foreign policy." Id. at 440, 88 S. Ct. at 670-71 (footnote omitted). The Iron Curtain Act is consequently of no further force or effect in this Commonwealth.

We are left with the question of whether claimant presented sufficient proof of his identity. The orphans' court employed the burden of proof announced by our Court in *Bokey Estate,* 412 Pa. 244, 194 A. 2d 194 (1963) to the effect that: " 'To defeat the claim of the Commonwealth the evidence must be so *clear, precise and definite* in quality and quantity as to satisfy the court below that the relationship claimed existed.' (Emphasis supplied)." Id. at 249-50, 194 A. 2d at 197 (quoting *Link's Estate (No. 1),* 319 Pa. 513, 180 Atl. 1 (1935)).[4]

However, we do not believe such a severe burden is either necessary or appropriate in the present case. *Bokey Estate,* supra, and other cases where a similar

---

of Residents of Russia and its Satellites to Share in Estates of American Decedents, 25 S. Cal. L. Rev. 297 (1952) ; Heyman, The Nonresident Alien's Right to Succession under the "Iron Curtain Rule", 52 Nw. U. L. Rev. 221 (1957).

[4] While the orphans' court did not articulate the standard, it cited *Bokey Estate* as authority for the applicable burden of proof. 503, 67 S. Ct. 1431 (1947) ; see generally Birman, Soviet Heirs in American Courts, 62 Col. L. Rev. 257 (1962) ; Chaitkin, The Rights

burden has been imposed[5] involved situations where the decedent died *intestate.* There, claimants not only had to prove their identity as a qualified statutory heir but also that such an heir in fact existed. Thus, had John Demczuk died intestate, to receive the entire estate claimant would have had to prove that the deceased had a son, that the deceasd was not survived by any other heirs who would have competing or superior claims under the intestate laws, and finally that he, claimant, was in fact the son. See, e.g., *Bokey Estate,* supra, at 250, 194 A. 2d at 197. "Clear, precise and definite" evidence is an entirely proper standard in a case of intestacy to prove that a particular heir or class of heirs existed. Yet, this same standard is inappropriate where the existence of an heir is uncontested, and only claimant's identity as the heir is at issue.

In the case before us, the decedent's will recites that he has a son living in Russia, and thus no question is here presented as to whether John Demczuk ever had a son. A claimant has come forward purporting to be that son. No adverse claimant has presented himself in the twenty years since decedent's death. The orphans' court in 1956 was proceeding under the Iron Curtain Act, but we have here affirmed that statute's invalidity. Claimant is therefore to be treated no differently than if he were living in a sister state and presented himself, either personally or by an attorney, as the named legatee in a testamentary instrument. Specifically, claimant has to establish by a preponderance of competent evidence that he is, in fact, the individual named in the testamentary bequest. See generally, Henry,

---

[5] See, e.g., *Krepinevich Estate,* 433 Pa. 78, 248 A. 2d 844 (1969) ; *Davis Estate,* 365 Pa. 605, 76 A. 2d 643 (1950) ; *Link's Estate, No. 1,* 319 Pa. 513, 180 Atl. 1 (1935) ; Cf. *Garrett Estate,* 371 Pa. 284, 89 A. 2d 531 (1952).

Pennsylvania Evidence §21 (1953). We believe that the claimant now before us has adequately satisfied that task.

It is, of course, true ". . . that findings of fact by an auditor when approved by the orphans' court are entitled to as much weight as the verdict of a jury and will not be set aside except for manifest error." *Krepinevich Estate,* supra at 82, 248 A. 2d at 845 (citation omitted). However, ". . . [w]hile the auditor must determine the credibility of the witnesses (Dettra Will, 415 Pa. 197, 202, 202 A. 2d 827 (1964) ; Patterson's Estate, 237 Pa. 24, 27, 85 Atl. 75 (1912), an appellate court is certainly in as good a position as the auditor to judge the probative weight of evidence given by deposition." Id. at 83, 248 A. 2d at 846. The evidence in the present case is overwhelmingly documentary in nature and subject to our scrutiny.

Appellant has sought to bolster proof of his identity by submitting various affidavits, certificates, and powers of attorney which we will briefly review.

In *Bokey Estate,* supra, we noted that the power of attorney there involved only ". . . set forth that *a person purporting to be the sister Flora* appeared before the appropriate officials and executed the documents but in nowise compels recognition that *such person was in fact the sister Flora.*" Id. at 251-52, 194 A. 2d at 198. Similarly in *Krepinevich Estate,* supra, it was stated: ". . . powers of attorney prove nothing more than that the person signing the document claimed to be the person whose name he signed unless there is additional corroborative evidence." Id. at 85, 248 A. 2d at 847.

Appellant here adds to his power of attorney a certificate of acknowledgement executed by the United States Consul in Moscow which is distinct from the sort of document at issue in *Bokey Estate,* supra. The certificate reads in pertinent part: "I, ROBIE M. PALMER, Consul of the United States of America at Mos-

cow, USSR duly commissioned and qualified, do hereby certify that on this 23rd day of September 1969, before me personally appeared Grigory Ivanovich Demczuk *to me personally known,* and known to be to be the individual described in, whose name is subscribed to, and who executed the annexed instrument, and being informed by me of the contents of said instrument he duly acknowledged to me that he executed the same freely and voluntarily for the uses and purposes therein mentioned." (Emphasis added.)

One perceives that the certificate does not state that the individual represented himself to be Grigory Ivanovich Demczuk but rather that the individual is *personally known* to the Consul to be in fact Grigory Ivanovich Demczuk. Thus, we are not presented with a situation where the official act of a foreign notary has been authenticated by the local American consul, see Act of April 27, 1876, P. L. 49, 28 P.S. §223, but rather one where the Consul himself has certified that he personally knows the individual in question. See Act of July 24, 1941, P. L. 490, §§4, 5, as amended, 21 P.S. §§291.4, 291.5. This particular certificate is of significant probative value in determining claimant's identity.

Additionally, appellant has introduced an affidavit prepared by Adam Mikhilovich Konovalchuk and Kliment Nikanorovich Omelyanchuk in 1956 that they live in the village of Myakoty, know the entire Demyanchuk family, and have no interest in his estate. They state that the deceased lived in their village and married Domnikia Pavlovna Filinyak in 1911. They further aver that while the deceased emigrated to the United States, his wife and their only son, Grigory Ivanovich Demyanchuk, who was born in 1911, remained in Myakoty.

Claimant has also presented affidavits prepared in 1966 by Iosif Ivanovich Liashinsky and Marfa Nikitichna Ryzhik, former residents of Miakoty, substantiating

the above described affidavit. Further, purported copies of his parents' marriage certificate and his mother's death certificate have also been produced by appellant, as well as an affidavit by a resident of New York, who is allegedly fluent in Russian and familiar with the Ukrainian dialect, stating that "Hrihori" and "Grigory" are "phonetic transcriptions" of the same name.

While these pieces of evidence viewed separately might not establish claimant's identity beyond a reasonable doubt,[6] in the aggregate they are sufficient to satisfy the requisite burden so that he may now take under the will.

As we have decided the issue of identity on its merits, we need not reach the question of whether the orphans' court erred in denying the petition for letters rogatory. The decree of the Orphans' Court of Bucks County is reversed and the record remanded for proceedings consistent with this opinion. Costs on the estate.

---

[6] The orphans' court was concerned that while the handwriting of the 1969 power of attorney was similar to two previous powers of attorney purportedly executed by claimant, ". . . [t]hree times zero is still no more than zero." The court also noted that the certificates (marriage and death) were only copies, and that the affidavits were suspect because they were made in similar language.