**In re: Estate of Doris ROSEN, Deceased.**

**Appeal of: Mark Fastovsky and Yakov Lemberberg and Leonid Rigey and Ilya Rigey, Appellants.**

Superior Court of Pennsylvania.

Argued Sept. 10, 2002.
Filed March 11, 2003.

Andrew E. Steckiw, Philadelphia, for appellants.

Paul L. Feldman, Philadelphia, for Ostroff, participating party.

Before: McEWEN, P.J.E., FORD ELLIOTT and POPOVICH, JJ.

FORD ELLIOTT, J.

¶ 1 Mark Fastovsky, Yakov Lemberberg, Leonid Rigey, and Ilya Rigey (appellants) appeal from the May 21, 2001 decree of the Court of Common Pleas of Philadelphia County, Orphans' Court Division. We are constrained to vacate that decree in part.

¶ 2 The following factual summary is taken from the Orphans' Court adjudication:

This Account was called for audit before the Honorable Francis X. O'Brien on September 8, 1997.

Doris Rosen (the 'Decedent') died intestate on November 12, 1995. The Decedent never married and had no issue. Her only sibling predeceased her. Her father, Harry Rosen, died in the 1950's, and nothing is known of her mother; the Estate was raised on November 29, 1995 by Goldie Rosen Ostroff, a first cousin of the Decedent. On November 29, 1995, Goldie Rosen Ostroff, was granted letters of administration by the Register of Wills' of Philadelphia County. Proof of publication of the grant was submitted and annexed [t]hereto.

Payment of transfer inheritance tax of $70,496 on August 13, 1996 and $17.87 on December 14, 1996 was duly vouched.

No one claimed the family exemption.

It is stated that notice of the audit has been given to all parties having a possible interest in the estate. No notice was given to the Russian Claimants [appellants herein]. However, they appeared by counsel and filed objections which was the basis of the aforementioned hearing.

Initially, the Administratrix proposed to distribute the entire amount of the net Estate to herself as the closest living relative entitled to take under the laws of intestate succession.

At the Audit, two sets of Objections were filed.

The first set of Objections was filed by Gloria Robinson and Wilfrid Rosen, who were (the Estate later conceded) the

daughter and son, respectively, of Samuel Rosen, brother of Harry Rosen (the Decedent's father) and Herman Rosen (the Administratrix' father), and thus additional first cousins of the Decedent (hereinafter, Gloria and Wilfrid will be referred to collectively as the 'Other First Cousins'), entitled to share the estate equally with the Administratrix.

The second set of Objections was filed by three additional purported first cousins of the Decedent, Mark Fastovsky, Yakov Isakovich Lemberberg and Leonid Illich Rigey (or Ryzhiy) and by Ilya Alexandrovych Rigey, the son of a fourth additional purported first cousin, Alexander Illich Rigey (or Ryzhiy), who passed away *after* the Decedent. Fastovsky resides in Cleveland; the others reside in Russia (Fastovsky, Lemberberg and Leonid and Ilya Rigey are hereinafter collectively referred to as the 'Russian Claimants').

The Administratrix (and the Other First Cousins) denied any knowledge of the Russian Claimants, and the matter proceeded to trial before Judge O'Brien [o]n June 1, 2001. Of the Russian Claimants, only Fastovsky appeared before the Court in person; the others instead relied on Fastovsky's testimony, and upon documentary evidence allegedly obtained from various civil authorities in the former Soviet Union.

Orphans' court adjudication, 4/6/01 at 7–9 (footnotes omitted).

¶ 3 Following the June 1, 2000 hearing, the parties filed memoranda of law. In January 2001, the Honorable Alex Bonavitacola was assigned to the case; and on March 20, 2001, he entertained oral argument on the objections to the account. On April 6, 2001, Judge Bonavitacola entered a decree, overruling the objections of the eastern European claimants and sustaining the objections of the other first cousins.[1] On May 1, 2001, however, he entered an amended decree, finding in addition that the first cousins once removed were not entitled to share in the estate and overruling their exceptions. The decree also ordered that a hearing scheduled for May 15th should instead consist of argument on the legal issues presented in the three paragraphs of the May 1st decree overruling the objections of the eastern European claimants and the first cousins once removed.[2] On May 21, 2001, the chancellor denied all exceptions and issued a final decree, relying on its adjudications of April 6th and May 1st. This timely appeal followed.

¶ 4 On appeal, appellants raise the following claims:

1. Whether the trial court erred in holding that each appellant must personally appear and testify before the court in order to prove his entitlement as an heir-at-law.

2. Whether the trial court erred in holding the testimony of appellant Fastovsky insufficient to establish kinship with decedent under the 'clear, precise and definite' standard of proof.

3. Whether the trial court erred in categorically rejecting appellants' uncontroverted foreign documents as inadmissible and outside the scope of the hearsay exception under the relaxed standards of the codified rules of evidence.

---

1. In the interests of accuracy, we will refer to the purported "Russian" claimants as "eastern European" claimants.

2. The certified record does not include a transcript of the oral argument.

4. Whether appellants as foreign claimants were denied due process and equal protection of the law.

Appellants' brief at 13.

■ ¶ 5 Appellate review of an equity matter is limited to a determination of whether the chancellor committed an error of law or an abuse of discretion. *Soderberg v. Weisel* 455 Pa.Super. 158, 687 A.2d 839, 842 (1997). In the usual case, we are bound by the chancellor's findings of fact, including findings regarding the credibility of witnesses, because the chancellor has the opportunity to hear the witnesses and observe their demeanor on the stand. *Hera v. McCormick,* 425 Pa.Super. 432, 625 A.2d 682, 685 (1993). In a case such as this, however, where the chancellor who issued the final adjudication and decree did not hear the witnesses testify, "'an appellate court is certainly in as good position as the [chancellor] to judge the probative weight of evidence ....'" *Estate of Demczuk,* 444 Pa. 212, 219, 282 A.2d 700, 703 (1971), quoting *Krepinevich Estate,* 433 Pa. 78, 82, 248 A.2d 844, 845 (1969) (observing that an appellate court is in as good position as an auditor to judge the probative weight of evidence given by deposition). Our review is therefore "limited to a determination of whether there was an error of law and whether the chancellor's factual findings are supported by sufficient evidence." *Id.* In order to do justice among the parties, however, we must first address some legal complexities the facts of this case present, which compel us to review the foundation of the law of intestate succession.

■ ¶ 6 In cases of intestacy, "[i]t is only by the grace of the commonwealth that heirs or legatees are permitted to receive any benefit from a decedent's toil and energy." *Link's Estate,* 319 Pa. 513, 516, 180 A. 1, 2 (1935).[3] As the *Link's Estate* court continued, "But [the commonwealth] reserves to itself the right, as it always has, to take the property of a decedent when under its laws there is no one in a position to inherit." *Id.* at 516–517, 180 A. at 2. Continuing, the *Link's Estate* court opined, "In such circumstances, the commonwealth stands in relation to the property of the decedent as one asserting a substantial right thereto." *Id.* Thus, according to our supreme court, "The commonwealth's claim is not based on charity, gratuity, or unearned benefit; it was by its protection that it was possible for the decedent to acquire such accumulation of property as he possessed." *Id.* As a result, "To defeat the claim of the commonwealth, the evidence must be so clear, precise, and definite in quality and quantity as to satisfy the court below that the relationship claimed existed." *Id.* at 522–523, 180 A. 1, 180 A. at 5.

■ ¶ 7 In this case, the eastern European claimants are not attempting to defeat the Commonwealth's claim; rather, they are attempting to include themselves among the class of heirs who have already defeated that claim. Furthermore, as our supreme court opined in dicta, in a case of intestacy, a claimant, such as the administratrix of decedent's estate herein, must also produce satisfactory proof that others of equal or closer kinship are not available to inherit. *Estate of Demczuk, supra* at 218, 282 A.2d at 703. *See also Krazukowski's Estate,* 70 Pa. D. & C.2d 464, 467

---

**3.** The supreme court decided two cases concerning Link's estate: the one we have cited addressed claims of German claimants to the estate; the other, *Link's Estate,* 319 Pa. 543, 180 A. 15 (1935), addressed the claims of residents of Butler County, Pennsylvania to the estate. Throughout this opinion, we will be citing the supreme court's decision affecting the German claimants.

(1974), citing *Estate of Demczuk.*[4]

¶ 8 Pennsylvania has therefore established rules and procedures a personal representative must follow to protect the interests of all putative heirs, including those in foreign countries. Rule 13.2 of the Pennsylvania Orphans' Court Rules provides:

If it appears that the decedent may have heirs in a foreign country but their location, existence or identity is unknown, the fiduciary shall notify the consulate of the country prior to audit of such facts as the fiduciary has which led him to the belief that the decedent may have had heirs in the country in question.

Pennsylvania Orphans' Court Rule 13.2, 42 Pa.C.S.A. Rule 13.3, Report by Fiduciary, provides in pertinent part, "Whenever the existence, identity or whereabouts of a distributee is unknown ... the fiduciary or his counsel shall submit to the court or auditor ... a written report outlining the investigation made by him and the facts relevant thereto." Pennsylvania Orphans' Court Rule 13.3, 42 Pa.C.S.A.

¶ 9 In this case, the eastern European claimants averred in their brief in support of their claim to a distribution from the estate that the administratrix "neither notified any other first cousins of the Decedent nor conducted an investigation to determine the existence and entitlement of other first cousins, particularly those residing overseas in Eastern Europe." (Brief in Support of the Claim of [the Eastern European claimants] to Distribution from the Estate of Doris Rosen, Deceased at 1–2 ("eastern European claimants' brief"), R. at envelope marked Exhibits, briefs, memos of law, copies, etc. ("envelope")).

¶ 10 Our review of the certified record supports the claimants' allegations: we were unable to locate a report indicating the scope of the administratrix' investigation, if any, or any indication that the administratrix notified the relevant consulates. While the administratrix of the estate did provide notice to the eastern European claimants or their attorney that she had filed the first and final account of the estate, the notice merely informed them that the administratrix "can not acknowledge" their interest in the matter. Nothing in the record indicates what, if any, search the administratrix conducted to locate any of her first cousins, either in this country or abroad. Administratrix did not hire anyone, either translator or genealogist, to locate potential heirs in eastern Europe, even though Harry Rosen's U.S. immigration and naturalization papers indicated he changed his name from Gersh Rigey to Harry Rosen; he was born and married in Barr, Russia; and decedent and her brother were also born in Barr, Russia and came to this country with their father. (Exhibit R–11.)

¶ 11 At the hearing on the objections, counsel for the estate acknowledged that the decedent had six uncles and aunts who were her father's siblings. (Notes of testimony, 6/1/00 at 5.) Two uncles immigrated to the United States and, like decedent's father, changed their surnames from Rigey to Rosen. One uncle, Eli Jankelevych Rigey, and three aunts: Ita Jankelivna Rigey, Sluva (Sofiya) Yankelivna Rigey, and Sarah Jankelivna Rigey, remained in eastern Europe. Counsel for the estate also acknowledged it was not contesting that first cousins, including administratrix, were decedent's closest relatives, and that one of decedent's Rosen uncles had living

---

4. We recognize that common pleas court decisions are not binding on appellate courts. *Jamison v. Concepts, Plus, Inc.,* 380 Pa.Super. 431, 552 A.2d 265, 267 (1988), citing *City of Philadelphia v. Price,* 419 Pa. 564, 215 A.2d 661 (1966).

children who were also first cousins, and were therefore entitled to inherit. (*Id.* at 8, 11.)

¶ 12 Thus, while the estate contested whether the eastern European claimants were, in fact, the children of the eastern European aunts and uncles of the decedent, at the hearing at least the estate did not contest the existence of the aunts and uncles. In fact, it is not even clear from counsel's presentation to the court whether the estate challenged the **existence** of eastern European first cousins, or merely the identity of the claimants as those first cousins. (*See id.* at 17–19 (contesting the eastern European cousins' entitlement based upon the authenticity and genuineness of the documents and the issues of identity and relationship).)

¶ 13 In its brief to the court following oral argument, the estate challenged the rights of the eastern European claimants on several grounds: 1) they relied upon reconstructed foreign documents without proof that these documents would have been recognized in their countries of origin; 2) the genealogist who testified on behalf of the claimants did not bring copies of the rules, laws, and regulations of the eastern European states, which establish the procedure for authenticating documents prior to their being admitted into evidence; 3) the decision of the Tomsk City Court in Russia finding that Ilya Alexandrovych Rigey was the sole heir of Alexander Illich Rigey was inadequate to prove his entitlement to inherit without the full record of the foreign proceeding; 4) the powers of attorney, while possibly admissible, would be admissible only to prove that persons purporting to have an interest in the estate appeared and executed the documents; and 5) while Mark Fastovsky's testimony may have established that he is related to the three eastern European claimants, he was unable to produce

any evidence linking him to his putative maternal grandparents. (Brief of Administratrix in Opposition to Claim of Putative Foreign Heirs ("Estate's brief"), 1/22/01 at 3–9, R. at envelope.)

¶ 14 Nothing in the issues the estate raised indicates they were contesting the probable existence of putative first cousins in eastern Europe. Additionally, as noted *supra*, the *Commonwealth* is not challenging the existence of heirs entitled to take under the intestate laws. We therefore question whether **appellants** were required to prove by "clear, precise and definite evidence" that a class of first cousin heirs existed in eastern Europe. *See Estate of Demczuk, supra* at 217, 282 A.2d at 703 (opining that when the existence of an heir or particular class of heirs is contested, the claimant must prove by clear, precise, and definite evidence that a particular heir or class of heirs existed; also opining, "Yet, this same standard is inappropriate where the existence of an heir is uncontested, and only claimant's identity as the heir is at issue[ ]").

■ ¶ 15 We will nonetheless assume without deciding that the estate contested the existence as well as the identity of the eastern European first cousins. This leads us to appellants' third issue, alleging trial court error in categorically refusing to admit any of appellants' documents and records into evidence.

¶ 16 The procedural statutes of this Commonwealth applicable to this case provide, in relevant part:

§ 6105. **Acts of notaries public**

. . . .

(b) Foreign notaries.—The official acts and exemplifications of foreign notaries in accordance with the laws of their respective countries shall be prima facie evidence of the matters therein set forth, if they are authenticated as pro-

vided in section 5328 (relating to proof of official records). *Any litigant may be permitted to contradict by other evidence any such acts, exemplifications or certificates.*

42 Pa.C.S.A. § 6105(b) (emphasis added). Section 5328 provides:

### § 5328.  Proof of official records

. . . .

(b) Foreign record.—A foreign official record, or an entry therein, when admissible for any purpose, may be evidenced by an official publication or copy thereof, attested by a person authorized to make the attestation, and accompanied by a final certification as to the genuineness of the signature and official position:

(1) of the attesting person; or

(2) of any foreign official whose certificate of genuineness of signature and official position either:

  (i)   relates to the attestation; or

  (ii)  is in a chain · of certificates of genuineness of signature and official position relating to the attestation.

A final certification may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. *If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the documents,* the tribunal may, for good cause shown, admit an attested copy without final certification or permit the foreign official record to be evidenced by an attested summary with or without a final certification.

. . . .

42 Pa.C.S.A. § 5328 (emphasis added). This statute was enacted in 1976, effective June 27, 1978, and is patterned after the Uniform Interstate and International Procedure Act, §§ 5.01 to 5.04. *Id.* at Official Source Note.

¶ 17 In this case, the eastern European claimants not only presented their documents in accordance with the procedural rules cited *supra,* but brought to this country the Ukrainian genealogist, fluent in Ukrainian, Russian, English, and Latin, who obtained the documents. (Notes of testimony, 6/1/00 at 88.) She testified as to the procedure she followed in obtaining and authenticating each of the documents appellants sought to introduce into evidence, and also testified that all of the countries from which the official records were obtained maintained their records in the same manner, having chosen to continue the procedures established under the Soviet regime. (*Id.* at 122–124, 160–161.) She also testified that she had with her a copy of the procedures from the Ukraine, which she offered to counsel for the estate when he cross-examined her as to her knowledge of the local procedures. (*Id.* at 160.) Counsel for the estate did not, however, pursue this line of questioning after the court inquired why counsel for the estate had not obtained the local rules himself. (*Id.* at 161.)

¶ 18 Counsel for the estate acknowledged that he had "been given documents all along." (Notes of testimony, 6/1/00 at 90.) According to counsel, however, "I've been given reams of documents, most of which were not in English … none of which I could confront, none of which I could prepare for, especially in the context of this testimony." (*Id.* at 90–91.) We find this argument unpersuasive in view of the estate's fiduciary duty to ascertain the existence of putative heirs. Certainly, the estate was capable of hiring a translator or its own genealogist to "confront" appellants' documents and testimony. As the eastern European claimants' counsel ob-

served at the June 1st hearing, "[A] personal representative has some duty to ascertain who the heirs are. I have seen estates where personal representatives to cover their own tracks were hiring genealogists and do that research and we have had to do that in our case and of course I will argue this at the end of the case . . . ." (Notes of testimony, 6/1/00 at 111–112.)

■ ¶ 19 As appellants argue repeatedly in their brief to this court, in a case such as this, where the claimants present clear, cogent testamentary and documentary evidence, and the estate, despite ample opportunity to do so, presents no evidence challenging the accuracy or authenticity of that evidence, the estate has failed to rebut the claimants' *prima facie* case. (Appellants' brief at 26–33.) We agree.

¶ 20 We find that the documents at issue were produced in compliance with §§ 5328(b) and 6105(b), set forth *supra*. It was therefore incumbent upon the estate to contradict those documents by introducing other evidence if it wished to challenge their authenticity. The estate having failed to do so, we find that the chancellor erred when he questioned the authenticity and value of the "restored" records without any evidence in the record to contradict the genealogist's testimony. We do not believe the interests of justice are served by allowing the personal representative of an estate to ignore his or her responsibilities, even to the point of presenting no evidence or witnesses who could be cross-examined; no documentation of the search the estate conducted or the results of such a search; and, most tellingly, no cross-examination as to the authenticity of the restored documents, or the admissibility of those documents in their native lands. *Compare Estate of Kasula,* 456 Pa. 62, 67, 318 A.2d 338, 340–341 (1974) (opining that the purported foreign heirs failed to meet their burden when,

during the twenty-three years following decedent's death, they produced only two letters from an association of lawyers in Moscow and two powers of attorney executed before a Soviet notary by persons claiming to be the Russian heirs; whereas the estate produced evidence that repeated requests by counsel for the administrator for evidence of the purported heirs' entitlement were unproductive and its letters remained unanswered).

¶ 21 As a panel of this court recently opined:

> Although the statute and rule do not explicitly so state, we are satisfied that each contemplate[s] that potential beneficiaries entitled to notice include those who were ascertainable by the exercise of due diligence on the part of the executor or administrator. The statute and rule presuppose that a personal representative, as an officer of the court and a fiduciary for the heirs and distributees, would make an honest effort to determine those persons lawfully entitled to the estate.

*Estate of Alexander,* 758 A.2d 182, 187 (Pa.Super.2000). We recognize that *Estate of Alexander* is factually distinguishable; however, the rule of due diligence should be equally applicable in this case.

■ ¶ 22 Having concluded that the chancellor erred when he refused to admit appellants' documents into evidence, we also conclude that appellants met their burden of proving by clear, precise, and definite evidence in the form of those documents and the genealogist's testimony the existence of a class of eastern European first cousins. We must therefore determine whether appellants met their burden of proving by a preponderance of the evidence that they are, in fact, members of that class. *Estate of Demczuk, supra* at 217–218, 282 A.2d at 703. This question brings us to appellants' first issue: wheth-

er the chancellor erred in requiring that the eastern European claimants appear in person before the court to meet their burden.

¶ 23 Both the chancellor and the estate rely upon several older cases for the proposition that *"[e]x parte* affidavits are generally inadmissible as not being the best evidence, especially when the persons making them are living and able to testify either in court or deposition.... Direct testimony is of a higher grade and should be insisted upon in pedigree cases." *Link's Estate, supra* at 519, 180 A. at 4. In *Estate of Mackarus,* 431 Pa. 585, 246 A.2d 661 (1968), the supreme court upheld the denial of a claimant's petition for a commission or letters rogatory in order to testify abroad. The supreme court stated, "As a general rule, when a petitioner claims an estate, he must appear before the orphans' court personally." *Id.* at 594, 246 A.2d at 666.

¶ 24 Both *Link's Estate* and *Estate of Mackarus* are factually distinguishable, however, because the claimants in those cases were challenging the Commonwealth's claim to an intestate estate.[5] As the supreme court observed in *Link's Estate,* "We have no doubt that pedigree may be proven by certain types of hearsay evidence, but kinship which carries with it property against the claim of the state should be proved by something more than a guess, it should be built on a sound basis." *Link's Estate, supra* at 519–520, 180 A. at 4. (*See discussion supra* regarding the Commonwealth's rights to an intestate estate.)

¶ 25 We have also reviewed *Kasula's Estate, supra* at 68–69, 318 A.2d at 341–342, citing *Bokey's Estate,* 412 Pa. 244, 194 A.2d 194 (1963) (holding that a foreign

power of attorney showing only that persons purporting to be the decedent's children appeared before notary, asserted their claims of kinship, and in his presence executed the document was insufficient to establish either the existence of any children in the Soviet Union or affiants' identity as decedent's heirs).

¶ 26 From the foregoing, we discern a general rule that a person claiming a share of an estate must, in the usual case, and especially when challenging the Commonwealth's entitlement to the estate, appear before the Orphans' Court in person so that he or she may be cross-examined and subjected to the court's scrutiny. Nevertheless, pedigree may be proved by certain types of hearsay evidence under certain circumstances. Additionally, a foreign power of attorney and affidavit prove only that a person purporting to be an heir appeared before the notary and executed the document in the notary's presence unless the notary is personally acquainted with the individual appearing before him or her. *See, e.g., Demczuk Estate, supra,* at 219–221, 282 A.2d at 704–705 (finding that the claimant under a will proved his identity when he produced: 1) a power of attorney attested to by the Consul of the United States at Moscow, who personally knew the claimant and could therefore attest to his identity; 2) affidavits of heirship executed by members of the village in which decedent's family resided; 3) copies of birth, death, and marriage certificates; and 4) an affidavit by an individual fluent in Russian and familiar with Ukrainian that the claimant's name and the name in his purported father's will were the same).

¶ 27 In this case, the three eastern European claimants residing abroad pro-

---

**5.** Mackarus died intestate while he was in a Veterans' Administration Hospital; therefore, the United States also claimed entitlement to his estate. *Mackarus Estate, supra* at 590–591, 246 A.2d at 664.

duced: 1) powers of attorney identifying them as persons who claim to be Yakov Lemberberg, Leonid Rigey, and Ilya Rigey; 2) birth, marriage, and death certificates obtained by a professional genealogist who was fluent in Ukrainian and Russian and who met with each of the local registrars of records, as well as the appropriate regional and national officers and the U.S. consul where necessary, establishing that persons with the same phonetic names as the claimants stand in a first-cousin relationship to the decedent (in the case of appellant Ilya Rigey, he is the sole heir of a first cousin who survived the decedent); 3) the testimony of the genealogist, whom the court had qualified as a researcher in genealogy, that she gathered the documents and met with each of the three claimants, and that in her professional opinion they were the three men named in the documents; and 4) the testimony of Mark Fastovsky, the fourth claimant, who had immigrated to the United States in 1992, but who knew the European claimants personally while he was growing up and had last seen one of them in 1985 and another in 1991. (Notes of testimony, 6/1/00 at 45–66, 100; 6/2/00 at 164–165.)

¶ 28 We are aware that the estate challenged the credibility of Fastovsky's testimony, appellants' second issue. We are also aware of the estate's, and the court's, concern that Fastovsky, whose family records the genealogist had been unable to locate, could only establish his relationship to the decedent by establishing his relationship to the eastern European claimants. As the chancellor opined, "at best, [Fastovsky's] testimony established only that Fastovsky had relatives with names similar to those of the Decedent's relatives. '[P]roof of the identity of names, religion and nativity alone are insufficient to evidence family connection.'"

(Adjudication, 4/6/01 at 10, quoting *Link's Estate,* 319 Pa. 513, 180 A. 1 (1935).)

¶ 29 Since our supreme court's decision in *Link's Estate* in 1935, however, that court has adopted the Rules of Evidence, several of which are relevant to this appeal. Rule 803 provides in relevant part:

**Rule 803. Hearsay exceptions; availability of declarant immaterial**

The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

**(13) Family Records**

Statements of fact concerning personal or family history contained in family Bibles, genealogies, charts, engravings on rings, inscriptions on family portraits, engravings on urns, crypts, or tombstones, or the like.

. . . .

**(19) Reputation Concerning Personal or Family History**

Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history.

Pa.R.E. 803(13), (19), 42 Pa.C.S.A.

¶ 30 We therefore agree with appellants that Fastovsky's testimony concerning his family history was admissible. He testified that he knew his grandmother's name was Mira, but she died before he was born; however, he remembered his grandfather, who died when Fastovsky was five years old. He also testified that he remembered his Aunt Ita, who lived with his family until she married later in life, and knew her son Yakov Lemberberg, whom he last

saw in 1991, very well. Fastovsky also talked about how anxious his mother was when her three brothers emigrated and Gersh changed his name to Gary, because she was afraid mail would not reach him. He also remembered the family losing touch with the uncles who emigrated because of the political situation in 1937, which he referred to as "a terror of N.K.V.D." Fastovsky said he remembered the death of one of his uncles, Eli, in a Nazi concentration camp in Barr, Russia in 1942; and remembered that Eli's two sons were drafted and one, Leonid, who is still alive and whom Fastovsky last saw in 1985, was injured fighting the Germans. Fastovsky also testified that he knew the other son, Alexander, had died in Tomsk in 1996, leaving one son, Ilya. (Notes of testimony, 6/1/00 at 41–67.)

¶ 31 According to the chancellor, Fastovsky's testimony "standing alone, was simply insufficient to establish his kinship with the Decedent in the 'clear, precise and definite' terms required by law[.]" (Adjudication, 4/6/01 at 10, citing *Estate of Kasula, supra.*) Assuming Fastovsky was, in fact, required to establish his kinship by clear, precise, and definite evidence, we do not agree that we must view his testimony in a vacuum. We recognize a certain "leap-frogging" quality to the evidence presented in this case. Nonetheless, we conclude that the documentary evidence, which we have already found should have been admitted into evidence, together with the affidavits from the three eastern European cousins and the genealogist's testimony supporting the authenticity of their claims, should be considered along with Fastovsky's testimony when evaluating his claim. If we accept the three eastern European cousins as the decedent's heirs, and accept that Fastovsky has established his kinship with those heirs, then ***ipso facto,*** we must accept Fastovsky's kinship with the decedent.

¶ 32 According to the estate, however, "Both the credibility of the witness [Fastovsky] and the reliability of the oral history he testified to are now questions for the Court." (Estate's brief at 8.) Continuing, the estate argued,

> Had this witness searched diligently for relatives upon his arrival [in the United States] in 1992, he might have established himself to the satisfaction of his putative cousin, Doris Rosen, or Goldie Ostroff, the administratrix, and judicial proceedings might not have been resorted to in order to decide the issue at this time.

*Id.* at 8–9.

¶ 33 We are troubled by the estate's argument for two reasons. First, as noted *supra,* the chancellor who heard the evidence, including Mark Fastovsky's testimony, on June 1, 2000, is not the chancellor who entered the final adjudication; therefore, the adjudicating chancellor's ability to assess Mark Fastovsky's credibility is no greater than our own. We have carefully reviewed Fastovsky's testimony, keeping in mind its self-serving nature, and can find nothing in his account of the family history to raise the least suspicion as to its accuracy.

¶ 34 Second and more important, however, is the estate's obvious attempt to shift its fiduciary duty to locate heirs entirely onto the claimants' shoulders. As the chancellor notes, the administratrix, in her Petition for Adjudication, First and Final Account, and Proposed Distribution, took the position that she was the sole heir entitled to the decedent's estate. (Adjudication, 4/6/01 at 8.) Only later did she acknowledge the "other first cousins," even though they were living in the United States and were the children of her Uncle Samuel, one of the three brothers who immigrated to this country. None of the

three first cousins, who apparently deny knowledge of any eastern European relatives, was called to testify; in fact, the "other first cousins" were not even present at the hearing, one claiming illness and the other claiming to be out of the country. (Notes of testimony, 6/1/00 at 24.) Certainly, the eastern European claimants' position in this case, including Fastovsky's testimony, is no more self-serving than that of the administratrix and the "other first cousins."

¶ 35 Reviewing the chancellor's adjudication, weighing the equities in this case, we are constrained to conclude that the orphans' court erred when it rejected appellants' evidence and testimony out of hand, despite the estate's failure to confront that evidence. The estate demonstrated a lack of diligence in failing to present any evidence, call any witnesses, or provide any documentation of the search it conducted and the results of that search, and therefore failed to "contradict by other evidence" the documentary and testimonial evidence appellants presented. 42 Pa. C.S.A. § 6105(b). *Cf. Estate of Kasula, supra* at 67, 318 A.2d at 340 (observing that "[t]he evidence in opposition to appellants' claim established that repeated requests by counsel for the administrator for evidence of appellants' entitlement to share in the estate were unproductive.").

¶ 36 The orphans' court's final decree is vacated insofar as it overruled the objections of the eastern European claimants; the administratrix shall amend the distribution to award one-seventh shares of the estate to each of the six surviving first cousins and to Ilya Alexandrovych Rigey, who takes by representation the vested share of his first cousin father, who survived the decedent but has since died.

¶ 37 The final decree is vacated in part; case is remanded for proceedings consistent with this Opinion. Jurisdiction is relinquished.