FABE, Chief Justice,
with whom MAASSEN, Justice, joins, dissenting.
In my view, the court's interpretation of AS 88.30.028 is incorrect, and traditional methods of statutory construction-looking to the statute's text, legislative history and purpose, longstanding interpretations of administrative regulations, and policy considerations-all require the opposite interpretation. I would hold that AS 88.80.028 does not render a prisoner lacking collateral resources enumerated in subsection (a) personally liable for the costs of medical care obtained from outside providers. Accordingly, I respectfully dissent and do not join the plurality opinion.[1]
*40 Alaska Statute 33.30.028 is divided into two subsections. Subsection (a) states that medical care "provided or made available to a prisoner" is "the responsibility of the prisoner and the [five enumerated third-party collateral sources, such as insurers and government welfare agencies]." Subsection (a)'s assignment of liability is made "subject to (b) of this section." Subsection (b) directs the Department of Corrections (DOC) to "require prisoners who are without resources under (a) of this section" to pay for medical care "provided to them by the department" and also goes on to specify a minimum payment "based on the prisoner's ability to pay."[2] This appeal raises the question of whether a prisoner who has received medical care outside of the DOC system but does not have access to one of the enumerated collateral sources listed in subsection (a) is rendered personally liable for the cost of the outside medical services under AS 33.830.028.
In my view, the best reading of this statute is that subsection (a) creates personal Hability for all types of health care-both that provided in-house by DOC staff and contractors and that made available by outside medical providers-when the prisoner has a collateral source enumerated in subsection (a). But when a prisoner has no such collateral source, then subsections (a) and (b), read in conjunction, create personal liability on the part of the prisoner only for health care provided in-house by DOC but not for care rendered by outside health care professionals.
The court today takes a different view. It interprets this statute's "plain" and "natural meaning" as making the prisoner personally liable for all types of medical care, both in-house and outside-full stop-and creating third-party liability for those sources enumerated in subsection (a). The court interprets subsection (b) as having no effect whatsoever on subsection (a)'s assignment of liability, concluding instead that subsection (b) is merely a directive to DOC to charge a minimum payment to prisoners without resources enumerated in subsection (a) for care provided in-house by DOC.[3] The court reasons that (1) the statutory language "plain{ly]" [4] compels this "natural reading," [5](2) this interpretation is consistent with the statute's "primary purpose ... to reduce medical costs" [6] and the statute's legislative history indicating "an intent to take advantage of any financial resources to which a prisoner might have access," [7] and (8) DOC's regulations implementing this statute are not inconsistent with this interpretation.[8] In my view, the court has essentially redrafted the statute, disregarding its plain text, relevant legislative history, and a contrary interpretation by DOC. In doing so, the court has enacted a new policy that will harm the State's fiscal and public safety interests in supporting the successful reentry of prisoners into the community upon their release from incarceration.
The court's interpretation is foreclosed by the text of the statute. Subsection (a) specifically conditions its assignment of liability on *41 subsection (b): "[Thhe liability for payment of the costs of medical ... care provided or made available to a prisoner ... is, subject to (b) of this section, the responsibility of the prisoner and the [enumerated collateral sources]...."[9] The definition of "subject to" [10] and the legislature's deliberate choice to include it in this statute [11] show that subsection (a)'s assignment of liability must be read in conjunction with, and is limited by, subsection (b). If the court were correct, and subsection (a) established a flat assignment of personal liability while subsection (b) merely established an unrelated directive for DOC to charge mandatory minimum fees in certain cases regarding in-house care, then the subject-to clause would serve no purpose, and its deletion would not alter the meaning of the statute at all. But "[wle must ... presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.'" [12] The court today "step(s]l over the line of interpretation and engag[es] in legislation" [13] by reading out subsection (a)'s subject-to clause from the statute.
I would avoid such judicial redrafting of a legislative enactment by interpreting the statute as written: Subsection (b)'s requirement that DOC recoup some of the costs for in-house care "provided" by DOC for those prisoners without sources enumerated in subsection (a) must limit, by means of the subject-to clause, subsection (a)'s assignment of liability. The only interpretation that preserves all the words of the statute would draw on the distinction between subsection (b)'s use of "provided" and subsection (a)'s use of both "provided" and "made available." This distinction, in conjunction with the subject-to clause, would lead to the conclusion that subsection (a) makes a prisoner personally liable for medical costs provided in-house and for medical costs made available outside of DOC where the prisoner has a collateral source enumerated in subsection (a), but that subsection (a) does not make a prisoner personally liable for medical care rendered by outside healthcare professionals where the prisoner lacks an enumerated source from subsection (a). This interpretation respects the legislature's drafting choices, requires no additions to the statute, and makes no subtractions from the statute. Unfortunately, the same cannot be said of the court's interpretation.
The court responds to my argument by asserting that the subject-to clause is not superfluous because subsection (b) directs DOC to collect payment from prisoners under certain conditions.[14] This assertion simply ignores the meaning of "subject to" in the statutory phrase "subject to (b) of this seetion." The court would read this text, which plainly limits subsection (a)'s assignment of liability by demanding that it be read in conjunction with a limitation in subsection (b), as merely indicating to the reader: "And subsection (b) also exists, although it has no effect here." The court then claims that "elven if our reading of the statute did render the 'subject to' clause redundant," that redundancy "is closer to the text" than *42 my interpretation.[15] But my interpretation calls for no addition to, subtraction from, or alteration of the text of the statute. All it requires is acknowledging the meaning of "subject to," reading the two elauses in conjunction, and respecting the means employed by the legislature when it chose the text of AS 33.30.028. My interpretation does not create a "substantial negative implication";[16] rather, it follows the explicit statutory directive to read subsection (a) in conjunction with, and as limited by, subsection (b).
The court's interpretation of AS 88.30.028 creates another surplusage problem. Subsection (a) enumerates five collateral sources that are "responsibfle}" for the in-house and outside medical care costs of prisoners. If the court were correct that subsection (a) gives the prisoner responsibility for all costs incurred for all types of medical care, then enumeration of specific collateral sources would be redundant. Even without enumeration, DOC could still invoice those who are already derivatively liable for the prisoner's health care, such as the prisoner's insurer or a public agency providing benefits to the prisoner. The only possible purpose for enumeration of collateral sources in (a) that would not render the enumeration mere sur-plusage would be to limit, in conjunction with subsection (b) and the subject-to clause of subsection (a), prisoner liability for certain types of care where the prisoner lacks an enumerated source.[17]
The court responds by hypothesizing three purposes for enumerating collateral sources. But none of the court's reasons seem plausible. The court asserts that enumerating sources in subsection (a) "gives notice to potential collateral payers," [18] but it could hardly be news to an insurer that it is liable for medical costs covered by its contract with the insured.[19] It could hardly be news to a government agency that it would provide benefits for people who meet the qualifications for benefits.[20] And it could hardly be news to parents and guardians that they may be liable for the medical care of their minor children.[21]'The court also asserts that enumeration "provides prisoners with guidance about their payment and coverage options," [22] but the Alaska Statutes provide rules of law and are generally not thought of as means for providing non-binding financial advice to prisoners. And the court asserts that enumeration "provides the DOC with a list of alternative payers to collect from,[23]} but DOC could collect from anyone already liable for a prisoner's health care even without enumeration. Under the court's theory, the statute's legal effect would thus not be altered one iota by omitting enumeration, and the court does not resolve this surplus-age problem. Moreover, there is no indication whatsoever in the legislative history that the legislature had any such non-legal reasons for enumerating collateral sources.
*43 In sum, the court's opinion effectively deletes statutory text by omitting it from its main conclusion that subsection (a) assigns personal liability for all medical costs to the prisoner. The court's conclusion ignores the subject-to clause from the statute as well as the enumeration of collateral sources. Only by eliminating critical language in the statutory provision can the court read it to create the unconditional assignment of personal liability for all medical care that the court finds in AS 38.80.028 today.
The court's interpretation is also contradicted by the statute's purpose. It is clear from the legislative history of AS 38.80.028 that the legislature intended for this statute to deter frivolous prisoner medical complaints and the overuse of medical services.[24] It is also clear that this deterrence rationale outweighed any subsidiary goal of recovering costs.[25] (Indeed, almost all of the cost-savings discussion in the legislative history revolved around an entirely different statute that was part of the same bill and would make certain terminally ill prisoners eligible for special medical parole in order to remove from the public the burden of paying for their health care costs.)
That the statute's primary purpose is to deter overuse of medical resources supports the plain-text interpretation that subsection (a) assigns personal liability to the prisoner for all in-house care, but assigns personal liability only for outside care where a prisoner has a collateral source enumerated in (a). Prisoners are free to seek in-house medical services on their own volition, thus making copayment through personal liability a useful deterrent to frivolous medical complaints. But personal liability for a copayment for treatment by outside staff would not serve the goal of deterring frivolous overuse of medical services because prisoners receive outside medical treatment only upon referral from in-house prison staff[26] Simply put, with DOC medical staff standing as gatekeepers, there is no frivolous overuse of outside medical resources that would be deterred by personal liability for copayments.[27] *44 Thus, the statute's purpose is furthered by the text the legislature used to enact it; the court's interpretation of that text today does not further the legislature's goal.
Despite this clear legislative history, the court concludes that "the primary purpose of this statute is to reduce medical costs."[28] The court reaches this conclusion by quoting dicta from one of our prior cases interpreting AS 33.80.028 in which we held that the statute applied to former prisoners as well as current prisoners .[29] In that case, we stated: "Although the legislative history does not . explicitly address extending liability to former prisoners, preventing the State from collecting from prisoners to the fullest extent possible would contravene the statute's cost-saving purpose."[30] Citing only this very general statement of legislative intent from a case addressing a distinct issue, today's court concludes that including a "prisoner's personal wealth among those resources subject to reimbursement is consistent with the statute's primary purpose of reducing the DOC's medical costs." [31]
The court is incorrect in its conclusion that the primary purpose of the statute is to reduce DOC's medical costs through cost recovery. The court mistakenly relies on dicta regarding legislative intent in our pri- or decision interpreting AS 33.30.028. In that case, we addressed an issue for which there was no need to go beyond a conclusion that the purpose of the statute, stated at the highest level of generality, was cost savings. But reducing frivolous use of DOC medical services is a measure that saves costs. We had no reason to detail these more specific cost-saving goals, such as deterring over-use of in-house medical services, because examining legislative purpose at a high level of generality sufficed to answer the question presented. Accordingly, we did not purport to give the final word on the purpose of AS 38.80.028. By contrast, this case raises the question of the more specific purpose of the statute; one proffered purpose-raising revenue-favors one interpretation while another proffered purpose-deterrence of frivolous use of medical services-favors a different interpretation. As discussed above, the legislative history clearly indicates that deterrence of frivolous overuse was the primary purpose of AS 83.30.028.
The court today deletes from the statute the subject-to clause and the enumeration of collateral sources in subsection (a), and then reaches its conclusion by relying on an abstract statement of legislative purpose unsupported by the legislative history or the legislative text. Properly used, legislative intent can clarify statutory text, but the intent must be discerned carefully and should never supplant the plain meaning of unambiguous text.
The court relies on a single statement in the legislative history to support its conclusion that the legislature intended for AS 33.830.028(a) to establish personal liability for outside medical care. Its reliance is misplaced. The court quotes a staffer testifying in the House Finance Committee that the legislation was intended to reach "individuals . that will have other coverage or resources," including "the resources of someone that is independently wealthy." [32] The court concludes from these pieces of evidence that "the committee intended that a prisoner's personal wealth be included within the coverage of this statute." [33] The legislative history certainly does suggest that the legislature sought to make prisoners personally liable *45 for at least some expenses. For that matter, so does the legislative text of subsection (a). Thus, appeals to legislative history on this point are unnecessary. But this general statement of intent is simply irrelevant in this case. My interpretation of AS 88.30.028 would assign personal liability for at least some medical costs. The more specific question before the court today is whether AS 33.30.028 assigns personal lability in only those cases where a prisoner received in-house care and where the prisoner received outside care and also has enumerated collateral resources, or whether the statute also assigns personal liability in those cases where the prisoner received outside care and lacks enumerated collateral resources. In the end, the court points to absolutely no support for its reconstruction of the abstract purpose animating this statute, nor does it respond to or refute the voluminous contrary legislative history.
The court's interpretation is also inconsistent with the longstanding interpretation of the statute by DOC's own regulations. In 22 Alaska Administrative Code (AAC) 05.121, DOC implemented the authority granted by the legislature in AS 33.30.028. The regulations specify in subsection (b)(1) that "a prisoner is financially responsible for a co-payment for health care services provided to the prisoner by the department through department employees or designated contractors" [34] while subsection (b)(2) specifies that "a prisoner shall arrange for the department to obtain payment or coverage from one or more of the responsible parties set out in AS 38.30.028(a), if the prisoner receives health care services not provided through department employees or designated contractors." [35]
These regulations interpret AS 38.30.028 in accord with my interpretation of the statute and contrary to the court's conclusion today. Subsection (b)(1) makes the prisoner personally "financially responsible" for costs incurred in-house, while subsection (b)(2) conspicuously omits any declaration of personal financial responsibility for outside medical care and instead directs the prisoner to "arrange for ... payment ... from one or more of the responsible parties set out in AS 33.30.028(a)." The most natural reading of this language is that the prisoner is not personally financially responsible for outside medical care when he lacks enumerated collateral sources. The court concludes that "the regulation does not conflict with [its] reading of the statute," [36] which assumes that a prisoner is ultimately liable for the entire cost of all medical services received by the prisoner. But the court never addresses the conspicuous lack of assignment of personal financial responsibility in subsection (b)(2) of the regulation or the indirect phrasing of "arrange for." If the fact that a prisoner is potentially a "responsible party set out in AS 33.30.028" made the prisoner personally responsible for payment for outside care even without collateral sources, it would be an odd turn of phrase indeed to assign personal liability to a prisoner by directing the prisoner to "arrange for ... payment" from himself, particularly when DOC in the immediately prior subsection of the regulation has already demonstrated that it knows how to assign personal liability directly.
In my view, the language and legislative history of AS 88.30.028 are sufficiently clear that I would hold for Hendricks-Pearee on their strength alone. But even if the statute's meaning were ambiguous in this case, DOC's longstanding interpretation of AS 33.30.028 should resolve any lingering ambiguity.[37] (That DOC has adopted a contrary *46 interpretation of the statute during this litigation is of no moment.[38])
The court dismisses the import of DOC's interpretation by invoking two mutually con-tradietory reasons. First, the court indicates that the "plain" text and "natural reading" suffice to reach its preferred interpretation, implying that there is no lingering ambiguity in the statutory text for the regulations to resolve. As I discuss above, the best reading of the statute's text and purpose clearly favors my interpretation, but, at the very least, the statute is ambiguous, and the court must address DOC's contrary interpretation. Second, without acknowledging the contradiction with the first reason, the court states that the statute is "silen[t]" on the assignment of personal liability for the cost of outside medical care where a prisoner lacks enumerated collateral resources.[39] - The court then concludes that DOC's interpretation of the statute "properly goes no further" than the statute and "says nothing of divesting the prisoner lacking collateral resources of liability for outside services." [40] Not only is this argument as to statutory silence con-tradieted by the court's own argument about the plain meaning of the statutory text, it also contradicts itself: why would an interpretive regulation have to divest a prisoner of lability that is never assigned by the statute?
Finally, the court's interpretation of the statute creates a damaging policy that will undermine the State's fiscal and public safety interest in reducing recidivism and supporting prisoners' successful reentry into the community after release. When deciding questions of law, such as interpreting the meaning of a statute, we have repeatedly stated that "(olur duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[41] I would interpret AS 38.30.028 based on text, purpose, and administrative interpretation so that the statute enacts a reasonable policy: Prisoners will be deterred from frivolous over-consumption of medical services-both in-house and rendered outside the DOC system-while DOC will be able to recover costs when a prisoner has access to an enumerated source of coverage or benefits.
As the court interprets AS 88.30.028 today, the statute would inflict significant harms to the State's interests and to the individual liberty of former prisoners who have completed their sentences. When a prisoner receives substantial medical care that is uncompensated by collateral sources, DOC will be in the position of superintending the person's ability to save any money at all, starting while the person is in prison and extending indefinitely after release. If a former prisoner is lucky enough to reintegrate successfully and obtain a modicum of savings to secure a stable life, DOC will be able to seek reimbursement under AS 38.80.0228 years after release. In effect, DOC will have the power to prevent any former prisoner who received unreimbursed care from achieving more than a subsistence existence until the unreim-bursed cost of care is paid back. The logic of this claimed power would also seem to permit the State to withhold virtually any form of government assistance, including Permanent Fund Dividend payments, government salary disbursements, unemployment benefits, payments provided under contract, and welfare payments. It would also seem to permit the State to seek repayment by forcing former prisoners to liquidate their meager assets or borrow against future earnings from licenses or other non-tangible assets or unrealized gains.
I would conclude that the statute's text, purpose, and administrative interpretation *47 foreclose this result. The statutory text and legislative history make clear that the legislators thought they were passing a bill with only minimal charges for prisoners that would have the deterrent effect of a copayment for a subset of medical services.[42]
The court's policy choice will harm the State's interests in reducing ex-offender recidivism, protecting public safety, and safeguarding the public fise. Personal financial resources are a crucial determinant of sue cessful prison reentry and recidivism prevention.[43] Reducing recidivism protects public safety by preventing future crime, and it also reduces State spending on investigation, prosecution, defense, and punishment stemming from the commission of future crimes.[44] It was thus reasonable for the legislature to adopt statutory text with the effect of limiting personal liability for outside healthcare expenditures. The court's reconstruction of AS 33.30.028 institutes a new policy, one that harms these important State goals.
For these reasons, I would hold that AS 83.30.028 does not impose personal liability on prisoners for the cost of health care rendered by professionals outside of the DOC system where the person lacks a collateral source enumerated in AS 83.30.028(a). I would reverse the superior court and remand. I therefore respectfully dissent and do not join the plurality opinion.

. Because the court is evenly divided on the issue in this case, the plurality's opinion has the effect of affirming the superior court's ruling but will have no precedential value. See Alaska R.App. P. 106(a) ("In an appeal to the supreme court, any issue or point on appeal on which the justices are equally divided is affirmed in that appeal, but the issue or point decided by an equally divided court shall not have precedential effect."); Barnica v. Kenai Peninsula Borough Sch. Dist., 46 P.3d 974, 982 n. 1 (Alaska 2002) (Bryner, J., dissenting).

. AS 33.30.028 reads, in relevant part:
(a) ... [The liability for payment of the costs of medical ... care provided or made available to a prisoner ... is, subject to (b) of this section, the responsibility of the prisoner and the
(1) prisoner's insurer if the prisoner is insured ...;
(2) Department of Health and Social Services if the prisoner is eligible for assistance
[[Image here]]
(3) United States Department of Veterans Affairs if the prisoner is eligible for veterans' benefits ...;
(4) United States Public Health Service, the Indian Health Service, or any affiliated group or agency if the prisoner is a Native American and is entitled to medical care ...;
(5) parent or guardian of the prisoner if the prisoner is under the age of 18.
(b) The [DOC] commissioner shall require prisoners who are without resources under (a) of this section to pay the costs of medical ... care provided to them by the department. Ata minimum, the prisoner shall be required to pay a portion of the costs based upon the prisoner's ability to pay.

. Op. at 9-10.

. Id. at 9.

. Id. at 15.

. Id. at 12.

. Id.

. Id. at 11-12.

. AS 33.30.028(a) (emphasis added).

. See Brack's Law Dictionary 1425 (6th ed.1990) (defining "subject to" as "[Iliable, subordinate, subservient, inferior, obedient to; governed or affected by; provided that; provided; answerable for"); WesstEr's New IntErnationat Dictionary 2509 (2d ed.1959) ("Being under the contingency of; dependent upon or exposed to (some contingent action);-with to." (emphasis in original)).

. The legislature routinely makes one provision in a statute "subject to" another, limiting a party's liability resulting from the first provision by referencing a second provision in such a way as to subtract liability from the first provision. See, e.g., ch. 70, § 14, SLA 1995 (amending the then-current version of AS 33.30.071(a) to declare that "the [State's] responsibility for providing necessary medical services for prisoners remains with the commissioner of corrections ... subject to the responsibility for payment under AS 33.30.028").

. Kodiak Island Borough v. Exxon Corp., 991 P.2d 757, 761 (Alaska 1999) (quoting Rydwell v. Anchorage Sch. Dist., 864 P.2d 526, 530-31 (Alaska 1993)).

. Gottschalk v. State, 575 P.2d 289, 296 (Alaska 1978) (quoting Commonwealth v. Armao, 446 Pa. 325, 286 A.2d 626, 632 (1972)).

. Op. at 9-10.

. Id. at 10.

. 1d.

. Enumeration of sources in subsection (a) does not, on its own, create third-party liability on the part of anyone. In order to have the third-party deemed "responsib[le]" by AS 33.30.028(a), the prisoner must already be eligible for benefits from a public agency or have an insurance plan that covers such costs. Indeed, the state legislature simply would not have the power to make a federal agency like the United States Department of Veterans Affairs "responsib[le]" for a prisoner's medical costs unless federal law already provided for such responsibility. Accordingly, the court may not rely on the creation of third-party liability as a non-surplusage purpose for the enumeration in subsection (a).

. Op. at 10.

. See AS 33.30.028(a)(1) (making certain types of medical care the "responsibility" of the "prisoner's insurer if the prisoner is insured").

. See AS 33.30.028(a)(2)-(4) (making certain types of medical care the "responsibility" of the Department of Health and Social Services and the United States Department of Veterans Affairs, "if the prisoner is eligible," and the United States Public Health Service or the Indian Health Service, "if the prisoner is a Native American and is entitled to medical care from those agencies or groups").

. See AS 33.30.028(a)(5) (making certain types of medical care the "responsibility" of the "parent or guardian of the prisoner if the prisoner is under the age of 18").

. Op. at 10.

. Id.

. Staffer Dennis DeWitt testified to the House Finance Committee that the statute is "designed to act as a deterrent to frivolous complaints." Similarly, DeWitt told the Senate Judiciary Committee that the statute "allows the Department of Corrections to establish a billing mechanism for medical services within prisons to help control medical services, similar to a deductible in a traditional health insurance policy." - Assistant Attorney General Michael Stark informed the House Finance Committee that "the legislation will deter frivolous medical complaints" and that the harm the legislation was designed to prevent stemmed from the fact that "institutionalized populations often include individuals that manifest medical complaints in which there is no basis in fact." Representative Eldon Mulder told the House committee that "[the whole thing is to make certain there is a need for a doctor so they know it costs to see a doctor." Minutes, H. Judiciary Comm. Hearing on H.B. 219, 19th Leg., 1st Sess. (Mar. 24, 1995).

. DeWitt testified to the House committee that "the co-payments would be small" because the statute ""is an attempt to allow the Department to get control on utilization as opposed to securing revenue." Representative Mulder stated to the committee that "[this is one of those areas where they are trying to do a little bit of cost prevention" (emphasis added) while DOC Special Assistant Jerry Shriner "stressed that collection would be difficult and the cost of collecting could exceed the amount collected." Representative Con Bunde "stated he wouldn't look at it to really recapture much money, and the net result might be by the time the paperwork is done, there is no money return." Representative Bunde went on to state that "that's simply a token payment so that they're reminded of their cooperation in their rehabilitation or whatever.... [It's not going to make any money necessarily for the Department of Corrections.... I just want to make sure that we understand we're not making a fiscal impact while we do this." When the bill was passed out of committee, it received "zero fiscal notes" indicating that it was not expected to impact the budget. I4.

. DOC's brief states that the rationale "to provide ... a disincentive to making frivolous requests for care ... does not apply to care received from outside providers because outside specialist referrals are made only at the direction of the DOC medical staff." See also DOC Policy & Procedure 807.02 IV.D.4 ("The Department may use consultants and specialists as needed to provide health care services to prisoners as outpatients or through hospitalization. The health care practitioner, in coordination with the Superintendent, shall initiate referrals for special services and routine consultations services. The Medical Director must approve all non-emergency referrals.").

. The court asserts, without any explanation, that the requirement that prisoners obtain DOC approval before seeking or obtaining outside care will not deter frivolous overuse of outside medical care; it then concludes that the goal of deter *44 ring frivolous overuse of outside medical care will instead be served by assigning personal liability for such care when prisoners lack enumerated collateral sources. Op. at 13-14. But it is unclear how medically necessary outside care, pre-approved by DOC, could ever be frivolous. The behavior that the court claims must be deterred is simply nonexistent, by definition. The court's claim that its "reading of the statute is better suited to achieving ... deterrence" of frivolous overuse of outside medical care, is thus utterly unsupported. Id. at 13.

. Id. at 12.

. State, Dep't of Corr. v. Hendricks-Pearce, 254 P.3d 1088, 1092-93 (Alaska 2011).

. Id. at 1093.

. Op. at 12.

. Id. at 12-13 (emphasis and omission from opinion).

. Id. at 13.

. 22 AAC 05.121(b)(1).

. 22 AAC 05.121(b)(2).

. Op. at 11.

. See Marathon Oil Co. v. State, Dep't of Natural Res., 254 P.3d 1078, 1082 (Alaska 2011) (defining the "reasonable basis standard ... under which we give deference to the agency's interpretation so long as it is reasonable, when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions"); State, Alaska Bd. of Fisheries v. Grunert, 139 P.3d 1226, 1232 (Alaska 2006) (stating that ""we consider whether the regulation is reasonable and not arbitrary. Where highly specialized agency expertise is involved, we will not substitute our own judgment for the board's. Our role is to ensure only that the agency has taken a hard look at the salient problems.").
*46 How and when to bill prisoners for medical expenses in order to deter frivolous overuse of medical services is clearly a question subject to DOC's agency expertise as established in its regulations.

. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

. Op. at il.

. 1d.

. Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979); see, e.g., Heller v. State, Dep't of Revenue, 314 P.3d 69, 72-73 (Alaska 2013).

. The legislative history is discussed more fully above. See supra notes 24-25. But the legislators' view that this bill would have only a limited reach bears reiterating here. The bill's sponsor, Representative Mulder, described the statute to the House Finance Committee as "adding a small cha[r]ge to inmates for medical care, as a way for Corrections to let inmates know that there is a cost for prescription drugs and medical relief." Assistant Attorney General Stark "emphasized that the provision is not intended as part of the punishment imposed on an inmate" but rather "that the legislation will deter frivolous medical complaints." - Minutes, H. Judiciary Comm. Hearing on H.B. 219, 19th Leg., 1st Sess. (Mar. 24, 1995).

. See generally Auaska Prisoner Reentry Task Force, Five-Year Prisoner Reentry StratEoic Puran, 2011-2016, at 26 (2011), available at http://www. correct.state.ak.us/TskForce/documents/Five-Year% 20Prisoner% 20Reentry% 20Plan.pdf (identifying "[How levels of ... vocational and financial achievement" as "criminogenic needs" leading to recidivism and reincarceration); id. at 65 ("[One of the greatest contributing factors to recidivism was indigence. ...").
The State understands the importance of successful prisoner reentry and the crucial role of personal income in reentry policy. Accordingly, DOC encourages all persons leaving prison to create "reentry plans" that include steps for earning income and accumulating personal savings. Araska Department or Corrections, Reentry Manuat 24-25, 32-33 (2012), available at http:// www.correct.state.ak.us/IskForce/documents/ Re% 20Entry% 20A11% 20edited% 20pg% 2040.-pdf.

. See generally Auaska StratEcaic Prax, supra note 43, at 4-5, 21-22.